**[J-92-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 705 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated January 9, |
| | : | 2015 in the Court of Common Pleas, |
| | : | Philadelphia County, Criminal Division |
| v. | : | at No. CP-51-CR-0428351-1993. |
| | : | |
| | : | |
| | : | |
| SHELDON HANNIBAL, | : | |
| | : | |
| Appellant | : | SUBMITTED:  January 20, 2016 |


**OPINION**


*Justice Dougherty delivers the Opinion of the Court, except with respect to Part VI.  Justices Baer and Mundy join the opinion in full.  Justices Todd and Wecht join the opinion, except with respect to the reasoning contained in Part VI, and Justice Todd files a concurring opinion in which Justice Wecht joins.  Chief Justice Saylor files a dissenting opinion, joined by Justice Donohue.*


**JUSTICE DOUGHERTY**                                    **DECIDED:  November 22, 2016**

Sheldon Hannibal appeals from the order of the Court of Common Pleas of Philadelphia County denying his petition for relief from his death sentence, filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§9541–9546, following an evidentiary hearing limited to one issue.  For the reasons set forth below, we affirm.

We summarized the underlying facts in our opinion on direct appeal affirming appellant's sentence of death.  *Commonwealth v. Hannibal*, 753 A.2d 1265 (Pa. 2000).  The facts pertinent to the current appeal are that on October 25, 1992, appellant and

codefendant, Larry Gregory, following an argument with the victim, Peter LaCourt, about the authenticity of a gold chain, took the chain and pistol-whipped LaCourt. LaCourt attempted to flee but stopped when appellant threatened to shoot him. LaCourt dropped to his knees, put his hands behind his head and appellant shot him six times, killing him. Fifteen-year-old Tanesha Robinson witnessed the robbery and beating, heard the gunshots as she fled the scene, and later gave a statement to police implicating appellant and codefendant. She also testified at their preliminary hearings. On August 4, 1993, however, she and two of her female friends were murdered execution-style (via close-range gunshots to the head) in an apartment located in the same housing development where LaCourt was murdered.

Appellant and codefendant were charged with the murder of LaCourt and were tried together. At trial, two witnesses testified concerning a plot to murder Robinson to prevent her from testifying at trial. Terrence Richardson testified he was present when codefendant and his brother gave two other men a .357 revolver and paid them $2,000 to kill Robinson, directing them to "be fast about it" and "don't leave [any] witnesses." N.T. 3/3/94 at 73. James Buigi testified he shared a prison cell with appellant in the fall of 1993 and appellant confided to him he shot and killed LaCourt during a robbery. Appellant additionally confided to Buigi he told "his friends" he needed Robinson "out of the way" because she was "the only witness that can hurt me in the trial." N.T. 2/28/94 at 122. Appellant told Buigi "my boys are loyal to me. They took care of that for me." *Id.* Appellant explained to Buigi his boys "found [Robinson] and shot her," and they killed the other females in the apartment because "they [were] not going to leave two witnesses behind[.]" *Id.* at 123.

Appellant testified at trial he did not know LaCourt or remember where he was on the night LaCourt was murdered; he did not have an altercation with LaCourt; he did not

take a chain from him; he did not own a gun or shoot LaCourt; he never shared a cell with Buigi and never discussed anything with him. Appellant also presented three character witnesses who testified to his reputation as a peaceful, law-abiding citizen. The witnesses were cross-examined regarding their knowledge of appellant's criminal record.

The jury convicted appellant and codefendant of first-degree murder. At the ensuing joint penalty phase proceedings, the guilt phase evidence was incorporated. Appellant testified and also presented the testimony of his aunt and his girlfriend who described him as patient, hard-working and a good father to his children. The jury found one statutory aggravating circumstance, 42 Pa.C.S. §9711(d)(6) (killing committed during perpetration of felony), and no statutory mitigating circumstances, rejecting appellant's assertion of the applicability of the age and catch-all mitigators, 42 Pa.C.S. §9711(e)(4), (e)(8), and thus, the jury sentenced appellant to death.[1]

On appellant's direct appeal, which preceded *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), appellant was represented by new counsel, and this Court afforded appellant unitary review of claims of trial court error as well as claims of trial counsel's ineffectiveness during the guilt and penalty phases.[2] Ultimately, we affirmed the

---

[1] The jury convicted codefendant of first-degree murder as well; he was sentenced to life imprisonment and the Superior Court affirmed the judgment of sentence. There are no issues in this appeal regarding codefendant.

[2] Before *Grant*, this Court required new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel entered the case, which was often on direct appeal. *See Commonwealth v. Hubbard*, 372 A.2d 687 (Pa. 1977). This rule was subsequently abrogated in *Grant*, which held claims of ineffective assistance of counsel generally should be deferred until collateral review. *Grant*, 813 A.2d at 738 (overruling *Hubbard*). Thus, in direct appeals decided prior to *Grant*, such as this, new counsel on appeal was obligated to raise claims of trial counsel's ineffectiveness or risk having them later be deemed waived on PCRA review.

judgment of sentence. Relevant to the issues on this appeal, we rejected appellant's substantive claim of the denial of a fair trial based on the introduction of evidence linking him to the murder of Tanesha Robinson, finding her murder was part of the history of the case and was admissible to show appellant's consciousness of guilt. For the same reason, we rejected his derivative claim of trial counsel's ineffectiveness for failing to object to the evidence about Robinson's murder. We additionally rejected appellant's claim of counsel's ineffectiveness for failing to subpoena prison records, which allegedly would have shown Buigi and appellant had not been cellmates, because we determined appellant failed to show such records existed. We also determined the trial court did not err in its instruction to the jury regarding the element of specific intent to kill as it related to first-degree murder and accomplice liability. *Hannibal*, 753 A.2d at 1269-71. Finally, we dismissed appellant's claim of trial counsel's ineffectiveness for failing to "obtain psychiatric assistance at the penalty phase" because appellant failed to indicate "what a psychiatric witness would have stated if one had been called." *Id.* at 1272 n.11.

Appellant filed a timely *pro se* PCRA petition in 2001, which was assigned to former Judge Willis Berry, Jr. for disposition as the trial judge, the Honorable Eugene H. Clarke, Jr. (now deceased), had retired. Unfortunately, considerable delay ensued. An amended petition was filed by counsel in 2005, the Commonwealth filed a motion to dismiss in 2010, and a number of additional pleadings were filed by both sides. In all, Judge Berry oversaw appellant's PCRA litigation for about eleven years, but retired from the bench without scheduling a hearing or issuing a decision. In 2012, the matter was reassigned to the Honorable Glenn B. Bronson who reviewed the amended petition, which contained sixteen issues, the motion to dismiss and the supplemental pleadings. The court determined the claims were without merit and issued notice of its intent to dismiss the petition without a hearing, to which appellant filed a response and the

Commonwealth filed an answer. The parties then agreed to an evidentiary hearing on the layered issue of trial counsel's alleged ineffectiveness for failing to present penalty phase mitigation evidence regarding appellant's cognitive functioning, and appellate counsel's failure to properly litigate the claim on appeal.

On July 18, 2014, Shawn Nolan, Esquire, Chief of the Capital Habeas Corpus Unit of the Federal Community Defender Office, entered his appearance for appellant and a three-day hearing was conducted shortly thereafter, on July 28, 29, and 31. Appellant presented neuropsychologists Dr. Carol Armstrong and Dr. Barry Crown, both of whom offered expert testimony, based on their tests and examinations of appellant, that he suffered from organic brain damage, most likely originating in his early developmental period, resulting in cognitive dysfunction and disability. Moreover, both experts testified they reviewed school, work and forensic records existing at the time of appellant's trial which, in their opinions, raised red flags indicating a neuropsychological exam should have been performed. Among other things, the records revealed appellant, who lived in Trinidad until his early teenage years, was illiterate upon entering his first year of schooling in the United States (ninth-grade in Philadelphia), and read at only the third-grade level two years later.

In response, the Commonwealth presented neuropsychologist Dr. Thomas Swirsky-Sacchetti, who offered expert testimony that his testing and examination revealed appellant was of low-average intelligence but had no brain damage of any kind. Dr. Swirsky-Sacchetti criticized the opinions of appellant's experts based upon their methodologies and test interpretations, and specifically criticized their opinions that appellant's inability to read at an appropriate age level was indicative of brain damage or anything other than his low-average intelligence combined with a lack of education.

Trial counsel, Thomas Q. Ciccone, Esquire, was deceased when the hearing was conducted, and direct appeal counsel, David M. McGlaughlin, also did not testify.[3] The PCRA court determined appellant's forensic, school and Job Corps work records were readily available to trial counsel who should have been reasonably alerted by the reports to pursue neuropsychological testing.[4] However, the court concluded appellant failed to show prejudice. As will be discussed in more detail below, the PCRA court credited Dr. Swirsky-Sachetti's testimony opining appellant had no brain damage and did not deem credible the contrary testimony of Drs. Armstrong and Crown. The court dismissed the petition. Appellant appealed to this Court raising fourteen principal claims. The PCRA court prepared a Pa.R.A.P. 1925(a) opinion addressing the claims. The issues raised in appellant's brief to this Court correspond with the claims he raised in his Pa.R.A.P. 1925(b) statement of matters complained of on appeal.[5]

---

[3] Attorney Ciccone died in 2006. Attorney McGlaughlin apparently was not subpoenaed to appear at the PCRA hearing and there is no affidavit in the record reflecting what his testimony would have been had he been called as a witness respecting direct appeal strategy.

[4] Appellant dropped out of school in the tenth grade to attend a Job Corps program in West Virginia where he learned bricklaying. He had good reports regarding his work skills, but it was noted he read only at a third-grade level. A mental health evaluation conducted in January 1994 listed an Axis II assessment of Personality Disorder with paranoid and anti-social features.

[5] Appellant's issues on appeal are ordered as follows: (1) the PCRA court erred in denying the petition without granting an evidentiary hearing on all claims; (2) the Commonwealth suppressed material impeachment evidence showing appellant and Buigi were not cellmates and counsel were derivatively ineffective; (3) the Commonwealth failed to disclose material impeachment evidence regarding Buigi's juvenile record for *crimen falsi* and use of aliases, and counsel were derivatively ineffective; (4) Buigi was an agent for law enforcement and interrogated appellant in the absence of counsel, violating appellant's rights, and counsel were derivatively ineffective; (5) the trial court erroneously instructed the jury it could find appellant guilty of first-degree murder if it found he or codefendant possessed the specific intent to kill, and appellate counsel was ineffective for failing to properly litigate this issue; (6) trial counsel was ineffective for opening the door to admission of appellant's prior criminal (continued…)

## I. Review Standards

We review a ruling by the PCRA court to determine whether it is supported by the record and is free of legal error. *Commonwealth v. Blakeney*, 108 A.3d 739, 748-49 (Pa. 2014), *citing Commonwealth v. Spotz*, 47 A.3d 63, 75 (Pa. 2012). Our standard of review of a PCRA court's legal conclusions is *de novo*. *Id.* at 749.

To be entitled to PCRA relief, appellant must establish, by a preponderance of the evidence, his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. §9543(a)(2). These errors include a constitutional violation or ineffectiveness of counsel, which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Id.* Additionally, appellant must show his claims have not been previously litigated or waived, and "the failure to litigate the issue prior to or during trial ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." 42 Pa.C.S.

---

(…continued)
record and for failing to object to the use of that record during the penalty phase; (7) the Commonwealth introduced evidence of appellant's alleged involvement in Robinson's murder; counsel were ineffective for failing to litigate this issue; the Commonwealth failed to disclose material exculpatory evidence showing appellant had not been involved in that homicide; and counsel were derivatively ineffective; (8) trial counsel was ineffective for failing to investigate, develop and present mitigating evidence of appellant's background, brain damage and mental health impairments at the penalty phase, and appellate counsel was derivatively ineffective; (9) the sole aggravating circumstance is invalid under Pennsylvania law and the United States Constitution; (10) the trial court erroneously failed to instruct the jury that life imprisonment is without possibility of parole, and counsel were derivatively ineffective; (11) appellant's rights to a fair sentencing proceeding and individualized consideration of aggravation and mitigation were violated by the joint proceeding with codefendant, and counsel were derivatively ineffective; (12) Pennsylvania violated the Vienna Convention of Consular Relations by failing to inform the Republic of Trinidad and Tobago of appellant's case, and by failing to inform appellant of his right to contact the Trinidadian embassy, and counsel were derivatively ineffective; (13) trial and appellate counsel were ineffective to the extent they failed to raise the above issues; and (14) cumulative prejudice.

§9543(a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which [appellant] could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. §9544(a)(2). An issue is waived if appellant "could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. §9544(b).

Most of appellant's issues are cognizable only as ineffective assistance of counsel claims. In analyzing such claims, we begin with the presumption counsel is effective. *Commonwealth v. Robinson*, 82 A.3d 998, 1005 (Pa. 2013). To prevail on an ineffectiveness claim, appellant must satisfy, by a preponderance of the evidence, the performance and prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In Pennsylvania, we have applied *Strickland* by looking to three elements an appellant must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) appellant suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. *See Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).[6]

Given the timing of appellant's direct appeal and the fact new counsel litigated claims of trial counsel's ineffectiveness on that appeal, his present claims sounding in trial counsel's ineffectiveness may implicate PCRA waiver, albeit the claims are

---

[6] Appellant, who is represented by federal counsel, makes clear he is raising federal Sixth Amendment claims under *Strickland*, obviously with an eye toward federal *habeas corpus* review if relief is denied here. This Court has made clear the Pennsylvania standard for ineffectiveness is the same as *Strickland*, albeit we divide the performance element into two sub-components. *See, e.g.*, *Commonwealth v. Laird*, 119 A.3d 972, 978 (Pa. 2015).

cognizable as claims of appellate counsel's ineffectiveness, to the extent appellant has "layered" the claims to account for both levels of prior representation. Respecting such layered claims, appellant must demonstrate not only that trial counsel was ineffective under the *Strickland* test, but that appellate counsel also was ineffective. *See Commonwealth v. McGill*, 832 A.2d 1014, 1023 (Pa. 2003). *See also Commonwealth v. Ali*, 10 A.3d 282, 292 (Pa. 2010). To the extent appellant faults direct appeal counsel for the manner in which he briefed preserved claims or claims of trial level ineffectiveness, those claims are not "layered," but focus directly on appellate counsel's performance under *Strickland* and its relevant progeny.

A court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first. *Robinson*, 82 A.3d at 1005, *citing Strickland*, *supra*; *Commonwealth v. Albrecht*, 720 A.2d 693, 701 (Pa. 1998). In addition, for purposes of efficiency, we may begin by assessing the merits of a defaulted underlying claim because, if we deem the claim meritless, neither trial nor appellate counsel could be found ineffective.

## II. Failure to conduct evidentiary hearing on all claims

Although appellant sets forth this claim in his questions presented as a stand-alone issue, he includes no stand-alone discussion of the issue, but instead weaves the issue into the arguments presented for a number of his underlying claims. Accordingly, we will address the propriety of the court's dismissal of claims without a hearing as necessary when they arise in the context of the discrete claims presented. We preliminarily note the PCRA court has discretion to dismiss a petition without a hearing when the court is satisfied "'there are no genuine issues concerning any material fact,

the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings.'" *Commonwealth v. Roney*, 79 A.3d 595, 604 (Pa. 2013), *quoting Commonwealth v. Paddy*, 15 A.3d 431, 442 (Pa. 2011), *quoting* Pa.R.Crim.P. 909(B)(2). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Roney*, 79 A.3d at 604–05, *quoting Commonwealth v. D'Amato*, 856 A.2d 806, 820 (Pa. 2004).

### III. Claims regarding testimony of James Buigi
### A. *Brady*[7] Claims (and ineffectiveness overlay)

**- 1 -**

Appellant disputes the veracity of Buigi's testimony claiming he and appellant were cellmates housed together in Cell 50 at the Philadelphia Industrial Correctional Center (PICC). At trial, appellant testified and claimed they were not cellmates at PICC; on cross-examination, appellant testified he was housed in Cell 50 during the relevant period, but his cellmate was someone named June. In rebuttal, the Commonwealth presented two prison guards who testified appellant and Buigi had been cellmates.

Appellant now claims PICC housing records attached to his amended PCRA petition show he was in Cell 19 while Buigi was housed in Cell 50; he also asserts the Commonwealth's failure to disclose these records was a *Brady* violation. Appellant insists the records were material, exculpatory "and/or" impeachment evidence, Appellant's Brief at 30, and he maintains the Commonwealth deliberately failed to

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

disclose the records at trial and on direct appeal.[8] Appellant argues that had the prison records been disclosed to the jury, the veracity of Buigi's testimony would have been undermined. He further asserts it is "reasonably likely" the guilt and penalty phases of the trial would have had different outcomes because Buigi's testimony was the only evidence tying appellant to the murder of LaCourt and involvement in the plot to murder Robinson. *Id.* at 31. Appellant argues, "Given the Commonwealth's reliance on Mr. Buigi, had Mr. Buigi's testimony been impeached, it is reasonably likely that one juror would have had a reasonable doubt of [a]ppellant's guilt or would have voted for life at [the] penalty [phase]." *Id.* In the alternative, appellant alleges trial and appellate counsel were ineffective for failing to investigate the records and subpoena them. Appellant also maintains, at a minimum, he is entitled to a hearing on the claim.

Initially, contrary to appellant's assertion, the record shows Buigi's testimony was not the only evidence tying appellant to the killing of LaCourt. At trial, Barbara Halley, who was with LaCourt when he was accosted by appellant and codefendant, identified appellant as the person who took Lacourt's gold chain, refused to return it, and began beating LaCourt. Halley further testified she ran to a security station in the building to report a robbery and then heard gunshots. When she, the security guard, and police officers returned to the scene, appellant was gone and LaCourt was dead.

Moreover, Tanesha Robinson's preliminary hearing testimony was read into the record at appellant's trial. Robinson had testified appellant had a gun, robbed LaCourt, beat LaCourt with the gun and threatened to shoot him if he fled. Robinson saw

---

[8] Appellant alleges the Assistant District Attorney (ADA) assigned the case on direct appeal corresponded with a Philadelphia Prisons official asking whether appellant and Buigi had ever shared a cell and received a reply the two had been housed on the same cellblock but not in the same cell. Copies of the correspondence are attached to the PCRA petition. Appellant alleges this correspondence was deliberately withheld.

LaCourt kneel and place his hands on his head. She also testified codefendant was armed and present at the scene, and she heard gunshots as she fled. She ran to her cousin's apartment, looked out the window, and saw appellant and codefendant put something in the trunk of a car before driving off.

In response, addressing the alleged failure to disclose the PICC prison housing records at trial, the Commonwealth asserts the claim is waived to the extent it was not presented on direct appeal and is previously litigated to the extent it was presented on direct appeal. Moreover, the Commonwealth asserts the claim is meritless because appellant proffered no evidence the Commonwealth possessed the records; the records were equally available to the defense; the records were not exculpatory; and there was no reasonable probability of a different outcome at trial had the records been introduced.

With respect to the alleged failure to disclose the correspondence between the ADA and the prison official on direct appeal, the Commonwealth asserts the letter from the ADA merely requesting the information was in no way exculpatory. The Commonwealth further stresses the reply received from the prison official addressed a period of time **before** appellant and Buigi were housed in PICC. Thus, the information provided showed the men were housed in the same cellblock but in different cells at Holmesburg Prison from August 31, 1993 to October 14, 1993, and says nothing about their circumstances during the relevant time period at PICC.[9] With regard to the claims of ineffectiveness based on the prison records, the Commonwealth asserts they do not satisfy the arguable merit prong of the ineffectiveness analysis.

---

[9] Subsequently, on May 14, 2013, a Philadelphia Prisons official prepared an affidavit stating his review of the records, which were incomplete, indicated appellant was never housed in Cell 50 while at PICC.

The PCRA court determined appellant could have raised his *Brady*-based theories on direct appeal but did not; thus, they are waived. The court further explained, on direct appeal, appellant raised a claim of trial counsel's ineffectiveness for "failing to subpoena prison records that would have shown that Buigi and [appellant] were never actually cellmates …[but t]hat claim was rejected by the Supreme Court on the ground that [appellant] failed to prove the records exist." PCRA Court Op. at 8. The court further reasoned, if the records existed and showed appellant was not in Cell 50, the records would have contradicted appellant's testimony at trial indicating he had been in Cell 50, but shared the cell with someone other than Buigi. Ultimately, the court reasoned the records were not material under *Brady* because, had they been introduced, they would not have affected the outcome of trial.

To succeed on a *Brady* claim, the defendant must show: (1) evidence was suppressed by the prosecution; (2) the evidence, whether exculpatory or impeaching, was favorable to the defendant; and (3) prejudice resulted. A *Brady* violation exists only where the suppressed evidence is material to guilt or punishment, *i.e.*, where there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Commonwealth v. Daniels*, 104 A.3d 267, 284 (Pa. 2014), *citing Commonwealth v. Tedford*, 960 A.2d 1, 30 (Pa. 2008). Importantly, *Brady* claims may be subject to waiver. *See Roney*, 79 A.3d at 609-12 (several *Brady* claims deemed waived on PCRA appeal for failure to raise them at trial or on direct appeal), *citing Commonwealth v. Chmiel*, 30 A.3d 1111, 1129-30 (Pa. 2011).

Here, the claim regarding the housing records from PICC raised on direct appeal sounded in trial counsel's ineffectiveness for failing to subpoena the records from prison authorities, a claim rejected as unsubstantiated by this Court. Appellant raised no *Brady* claim at trial or on direct appeal, even though it is apparent appellate counsel, at

least, had identified the underlying issue. Accordingly, the iteration of the present claim sounding in *Brady* is waived.

Furthermore, and relatedly, appellant's delineation of the *Brady* claim undermines its viability — if the records were available by serving a subpoena on the prison records custodian, as appellant asserts, then the records obviously were accessible to the defense and were not suppressed by the Commonwealth. *See Commonwealth v. Carson*, 913 A.2d 220, 245 (Pa. 2006) ("No *Brady* violation can occur where the evidence is available to the defense through non-governmental sources, or, with reasonable diligence, the defendant could have discovered the evidence.").[10]

Turning to appellant's ineffectiveness theory, on direct appeal, this Court dismissed appellant's claim of trial counsel's ineffectiveness for failing to subpoena the records. Accordingly, the present assertion of trial counsel's ineffectiveness for failing to procure the records is barred by the PCRA's prior litigation provision.

Appellant's stand-alone claim of appellate counsel's ineffectiveness also fails. Appellant claims direct appeal counsel was ineffective for failing to show the records existed, *i.e.*, by failing to obtain the records via subpoena. Had counsel done so, appellant claims, he could have shown trial counsel was ineffective for failing to obtain and use the records to impeach Buigi's testimony. However, as the Commonwealth points out, the records in question are inaccurate on their face, containing several obvious errors. For example, the print-out for movement in Cell 50 during the relevant period appears to indicate four prisoners simultaneously occupied a single bunk of a two-bed cell for several weeks. Moreover, appellant's trial testimony indicating he was

---

[10] Notably, the trial in this case predated the decision in *Kyles v. Whitley*, 514 U.S. 419 (1995), which extended the *Brady* duty to disclose information in the possession of police agencies; this further undermines appellant's *Brady* claim. *See Commonwealth v. Burke*, 781 A.2d 1136 (Pa. 2001).

in Cell 50, when the records indicate he was not, and the contrary testimony of the guards who indicated he shared the cell with Buigi during the relevant time, significantly undermine the assertion the records could have been effective and difference-making tools to impeach Buigi's testimony. Appellant, in short, fails to show the claim of appellate counsel's ineffectiveness based on a failure to obtain the records has arguable merit under the *Strickland/Pierce* test, and there is no issue of material fact warranting an evidentiary hearing on the question.

**- 2 -**

Appellant next alleges the Commonwealth failed to "disclose material exculpatory information" regarding Buigi's allegedly extensive and substantial record for *crimen falsi* juvenile adjudications and adult criminal convictions, and that Buigi used a number of aliases, including Tim Burgess and Brian Gilmore, as reflected not only in Buigi's juvenile record, but in his adult criminal record, and in the prison housing records discussed above. Appellant's Brief at 34, 35. Specifically, appellant argues confidence in the verdict is undermined because had the Commonwealth disclosed Buigi's record for *crimen falsi* and his use of aliases, trial counsel could have effectively impeached him, raising doubts about his veracity and making it "reasonably likely" the jury would have viewed his testimony with suspicion and returned a different verdict. *Id.* at 35. Alternatively, appellant alleges derivative ineffectiveness of trial and appellate counsel for failing to discover these records.

The Commonwealth maintains appellant failed to raise this claim of error in his concise statement of matters complained of on appeal. Our review of the certified record confirms appellant made no specific reference to Buigi's adult use of aliases or to

his adult criminal record in his Rule 1925(b) statement.[11]   Accordingly, we will confine our review only to the claims resting on Buigi's juvenile adjudications and juvenile use of aliases.  *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); *Commonwealth v. Castillo*, 888 A.2d 775, 780 (Pa. 2005) ("Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived."), *quoting Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998).  *See also Commonwealth v. Mason*, 130 A.3d 601, 635-36 (Pa. 2015) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.") (*citing* Pa.R.A.P. 302(a)).

With respect to Buigi's juvenile record, the PCRA court noted that, prior to July 12, 1995, "juvenile adjudications were inadmissible for impeachment purposes."  PCRA Court Op. at 11, *citing Commonwealth v. McKeever*, 689 A.2d 272, 274 (Pa.Super. 1997), *citing Commonwealth v. Katchmer*, 309 A.2d 591, 594 (Pa. 1973).  Because the juvenile adjudications were inadmissible at the time of trial, the court determined the underlying claim of the Commonwealth's alleged failure to disclose them lacked merit, and counsel could not be faulted for failing to raise a meritless claim.  We note, although the General Assembly subsequently amended 42 Pa.C.S. §6354(b)(4) to permit juvenile adjudications to be used for impeachment purposes, counsel cannot be deemed ineffective for failing to predict changes in the law.  *See Commonwealth v. Fletcher*, 986 A.2d 759, 801 (Pa. 2009), *citing Commonwealth v. Gribble*, 863 A.2d 455, 464 (Pa. 2004).

---

[11] The issue in appellant's concise statement apparently corresponding to the present claim on appeal alleges "Mr. Hannibal was denied due process and the effective assistance of counsel because the Commonwealth failed to disclose material impeachment evidence regarding the juvenile record of James Buigi, and counsel failed to investigate, obtain, and present such evidence."  Appellant's Pa.R.A.P. 1925(b) Statement at ¶(B)(2).

Nevertheless, appellant claims the PCRA court erroneously overlooked *Commonwealth v. Slaughter*, 394 A.2d 453, 458-59 (Pa. 1978), which recognized the propriety of the limited use of a witness's probationary status as a juvenile delinquent to probe the witness's possible bias on cross-examination. *Id.*, *citing Davis v. Alaska*, 415 U.S. 308 (1974) (right of confrontation requires defendant in state criminal case be permitted to cross-examine witness to probe possible bias deriving from witness's probationary status as juvenile delinquent, notwithstanding testimony would conflict with state's asserted interest in preserving confidentiality of juvenile delinquency proceedings). Appellant's reliance on *Slaughter* is misplaced as the decision in fact reiterates the former general rule prohibiting the use of juvenile adjudications for *crimen falsi* offenses to impeach a witness's credibility, but recognizes the High Court's exception, applicable to the states, permitting cross-examination regarding a witness's probationary status as a juvenile delinquent to show potential bias, presumably the witness's hope for favorable treatment by the state in exchange for his or her testimony. Accordingly, appellant's derivative claims of ineffectiveness based on the failure to attempt to impeach Buigi with his juvenile record for *crimen falsi* adjudications and the use of aliases, to impeach his credibility, must fail. *See Gribble*, 863 A.2d at 464.

## B. Sixth Amendment right to counsel during prison interrogation (ineffectiveness overlay)

Appellant claims his right to counsel during government interrogation was violated when Buigi allegedly agreed to act as an informant before he then deliberately initiated the prison conversation in which appellant incriminated himself. Appellant claims trial counsel was ineffective for not challenging the admissibility of Buigi's testimony on that basis, and appellate counsel was ineffective for failing to raise the ineffectiveness claim on appeal. Specifically, appellant claims although Buigi testified

that he did not initiate contact with police until after appellant incriminated himself, prison records show Buigi met with police a month before the incriminating conversation "for the purpose of being interviewed in regards to a homicide." Appellant's Brief at 39. Appellant additionally claims Buigi was not merely a passive listener, but elicited appellant's confessions by urging "if you want me to help you with your case, you got to tell me a little bit more about it." *Id.* at 40, *quoting* N.T. 2/28/94 at 112. Appellant alleges Buigi "then relayed the information [appellant disclosed] to Detective Rheinhold and the prosecution in exchange for leniency in his open cases." *Id.* at 42.

The Commonwealth responds the issue is waived because appellant did not adequately develop the claim Buigi was a government agent in any meaningful fashion before the PCRA court or cite relevant authority to support the claim. Alternatively, the Commonwealth asserts the claim is meritless as the record shows Buigi was not acting as a government informant or agent at the time of the conversation and did not initiate the conversation to elicit incriminating information. Instead, the Commonwealth maintains the record shows appellant sought Buigi's opinion regarding appellant's chances for a good outcome at trial. Thus, the Commonwealth asserts appellant failed to show merit in his ineffectiveness claim based on the alleged Sixth Amendment violation.

The PCRA court determined the underlying claim of a violation of the right to counsel was not raised below and thus is waived. The court also determined the averment Buigi was a government agent was conclusory and unsupported by the record and thus dismissed the ineffectiveness claims based on lack of arguable merit. Moreover, the court determined the claim raised no material fact warranting an evidentiary hearing.

The Sixth Amendment right to the assistance of counsel attaches at the initiation of formal judicial proceedings against an individual by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Commonwealth v. Briggs*, 12 A.3d 291, 324 (Pa. 2011). Any statement made by the individual thereafter which is "deliberately elicited" by police, without the individual making a valid waiver of the right to counsel, is deemed a contravention of this right. *Id.* A statement may be "deliberately elicited" by police through use of an informant. *Commonwealth v. Hawkins*, 701 A.2d 492, 505 (Pa. 1997). "Information secured by an informant acting as an agent of the government must be suppressed where the informant acts under instructions as an informant for the government, where he presents himself as no more than a fellow inmate rather than a governmental agent, and where the suspect is in custody and under indictment at the time of the questioning by the informant because such questioning outside the presence of the accused's counsel violates the accused's Sixth Amendment right to counsel." *Id.*, *citing Commonwealth v. Berkheimer*, 460 A.2d 233, 234 (Pa. 1983).

In order to prove such a violation, the defendant must demonstrate the police and the informant took some action, beyond mere listening, designed deliberately to elicit incriminating remarks. *Hawkins,* 701 A.2d at 505*, citing Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). Additionally, the defendant must show the informant was acting as a government agent. Individual acts do not become governmental action merely because they are later relied upon and used by the government in furtherance of governmental objectives. *Id.*, *citing Commonwealth v. Corley*, 491 A.2d 829, 832 (Pa. 1985).

The record supports the PCRA court's denial of this claim. Buigi testified at trial he initially learned of Peter LaCourt's killing in October 1992 from LaCourt's brother Harry Calindez (Harry). Buigi and Harry had been working together in the prison

kitchen at SCI-Camp Hill when Harry was called away by the chaplain. When Harry returned, he informed Buigi his brother had been murdered. Buigi testified he had known Peter LaCourt as Pete Calindez since junior high school, but had not seen him since 1987. Buigi further testified he was transferred to PICC in late October 1993, and had been interviewed by Detective Rheinhold as a potential witness in an unrelated murder investigation approximately a month before the transfer.

According to Buigi, following the transfer, he became cellmates with appellant who, after four days, began asking Buigi for his advice and opinions. Appellant subsequently confided he had killed Peter LaCourt and plotted to have Tanesha Robinson murdered. Buigi testified when he realized appellant's reference to Peter LaCourt was to Buigi's friend Pete Calindez, he called Detective Rheinhold to tell him he had information about the killing. The day after he made the call, Detective Rheinhold transported Buigi to Police Administration and took his statement.

Buigi also testified he was not expecting any leniency in his open felony matters in exchange for his testimony in this case. After Buigi finished testifying, the prosecutor informed the court that, although "the Commonwealth has absolutely no deals or agreements with respect to any of Mr. Buigi's open cases, I want the court to know, and I want it to be a matter of record that in the event Mr. Buigi is convicted on any of his open cases and I am subpoenaed to testify at his sentencing proceeding, that I will testify that he cooperated in this matter." N.T. 3/2/94 at 5. The court then granted the defense request to recall Buigi on cross-examination, where he testified if he was convicted on an open case, "[the prosecutor] would tell the judge I cooperated in this case." N.T. 3/3/94 at 37. He denied he was promised or expected sentencing leniency in that event, and the import of the prosecutor's involvement would be to show Buigi "t[old] the truth of what I knew about the case." *Id.*

In light of this record, the PCRA court did not err in determining appellant's claim Buigi was a government agent was unsupported and conclusory. The fact Buigi met with Detective Rheinhold before he was housed with appellant at PICC was uncontested, but the uncontradicted evidence showed the subject of that meeting was Buigi's knowledge respecting an unrelated homicide. There was no evidence the government enlisted or directed Buigi to initiate contact with appellant and elicit details about the murder of LaCourt and the plot to murder Robinson.

In the absence of direct evidence, appellant posits the record evidence raised a "reasonable inference" Buigi acted as a Commonwealth agent because he allegedly initiated questions designed to elicit incriminating information from appellant and relayed that information to the prosecution in exchange for leniency in his open cases. Appellant's Brief at 42. However, this is more than an inference: it is speculation premised on rejecting the actual trial evidence that appellant approached Buigi seeking his advice and opinions and later confided he committed the murder and was involved in killing an eyewitness. It was only after Buigi realized the murder victim was an acquaintance that he contacted police; and, although he obviously may have hoped his cooperation might result in consideration in his own cases, there was no promise of leniency in exchange for his testimony. Moreover, whatever promises or expectations arose after Buigi came forward do not operate retroactively to make him an interrogating agent of the police. In short, the unsupported inference appellant poses does not make this a factual situation implicating Sixth Amendment guarantees. *See Maine v. Moulton*, 474 U.S. 159, 176 (1984) (Sixth Amendment not violated whenever government by happenstance obtains incriminating statements from accused after right to counsel has attached; violation occurs when government obtains incriminating statements by

knowingly circumventing accused's right to have counsel present in a confrontation between accused and state agent).

Appellant's claim of a Sixth Amendment violation is waived for failure to raise it at trial or on direct appeal, as is his claim of trial counsel's ineffectiveness. Appellant's derivative claim of appellate counsel's ineffectiveness fails as the underlying claim of trial counsel's ineffectiveness lacks arguable merit. The claim also raises no issue of material fact warranting an evidentiary hearing.

### IV. Jury instruction regarding specific intent to kill

Appellant claims the trial court erroneously instructed the jury it could find him guilty of first-degree murder if the Commonwealth showed appellant, his accomplice or codefendant shot the victim with the specific intent to kill. Appellant claims the instruction was erroneous because it permitted the jury to find him guilty even if it determined only appellant's codefendant had the specific intent to kill. Appellant acknowledges trial counsel challenged the instruction during trial and appellate counsel raised the issue on direct appeal. Appellant further acknowledges this Court engaged and rejected the claim on direct appeal, determining the jury charge, as a whole, conformed to *Commonwealth v. Huffman*, 638 A.2d 961 (Pa. 1994), governing instructions on accomplice liability in first-degree murder prosecutions.

Appellant now claims appellate counsel was ineffective in litigating the issue because "he only argued that the court's instructions violated *Huffman* and failed to argue the instructions violated appellant's due process rights by impermissibly relieving the Commonwealth of its burden of proof." Appellant's Brief at 45. Appellant presents no targeted argument or legal analysis to support this gloss on the previously litigated theory other than a fleeting one-sentence assertion that "instructions that lessen the

Commonwealth's burden of proof violate due process. *See Osborne v. Ohio*, 495 U.S. 103, 122-25 (1990); *Francis v. Franklin*, 471 U.S. 307, [321] n.7 (1985)." *Id.* at 44.

The Commonwealth responds that on direct appeal this Court held, "[t]he instruction was not in error and the court consistently and in understandable language referred to the need to consider whether **each individual** in the case possessed the specific intent to kill." Appellee's Brief at 57, *citing Hannibal*, 753 A.2d at 1271 (emphasis added). Thus, the Commonwealth posits appellate counsel challenged the instruction in part on the basis it reduced the Commonwealth's burden of proof, and the present issue therefore "requires no extended response." *Id.* at 55. Similarly, the PCRA court determined "all prior counsel litigated the issue, and the issue was resolved on the merits against [appellant] by Pennsylvania's highest appellate court. No relief is due." PCRA Court Op. at 13.

Appellant has not explained how an undeveloped due process overlay, other than perhaps more specifically seeking to federalize the very same claim already posed, would have led to a different result on the merits on direct appeal. Nor does appellant explain why our decisional law in this area, including our resolution on direct appeal, includes no due process element, or is not derived from due process precepts. In light of this presentation, the PCRA court did not err in finding the underlying issue regarding the propriety of the instruction previously litigated and meritless. *See* 42 Pa.C.S. §9544(a)(2). The claim of trial counsel's ineffectiveness for failing to challenge the instruction has been previously litigated as well; and the claim appellate counsel failed to "properly" litigate the issue is unsupported by meaningful argument; thus, no relief is due.

## V. Opening the door to criminal record through character witnesses

## A. Guilt phase

Appellant alleges trial counsel failed to review the discovery provided by the Commonwealth regarding appellant's criminal history, and was thus unprepared when the Commonwealth cross-examined appellant's character witnesses regarding his criminal history during the guilt phase. Specifically, after each character witness testified to appellant's reputation as a peaceful, law-abiding citizen, the prosecutor posed questions on cross-examination regarding the witness's knowledge of appellant's prior criminal record for disorderly conduct, drug offenses, theft, burglary, conspiracy and contempt of court. Trial counsel objected and a side-bar was conducted during which counsel stated, "My client informs me that he has one conviction. I don't know anything about this record. That was not furnished to me. And I discussed it with my client." N.T. 3/8/94 at 8. Counsel further stated the "drug case is not *crimen falsi*." *Id.*

Appellant now claims counsel never met with him regarding his criminal history, did not review the discovery, which included a form listing all charges brought against him in the period from 1990 through 1992, and apparently did not realize non-*crimen falsi* offenses can be used to impeach reputation testimony. Appellant argues trial counsel was ineffective on these bases and appellate counsel was ineffective for failing to raise this meritorious, record-based claim of trial counsel's ineffectiveness on appeal.

The Commonwealth responds counsel discussed appellant's criminal history with him before trial and appellant does not show counsel acted unreasonably in presenting the character witnesses because his decision was based on appellant's false representation regarding the nature and extent of his criminal history. Further, appellant opened the door to the admissibility of much of his criminal history because he testified in his own defense, and thus, the Commonwealth could, if it chose, proffer any of appellant's *crimen falsi* convictions for impeachment purposes. Moreover, the

Commonwealth asserts, the trial court unambiguously instructed the jury it was not to consider appellant's prior convictions in deciding his guilt, except to the extent those convictions affected the weight to afford the reputation evidence he presented.

The PCRA court determined the claim of trial counsel's ineffectiveness could have been raised on direct appeal, but was not, and thus it was waived. The court further determined that underlying claim was meritless. Because appellant chose to testify on his own behalf, any of his *crimen falsi* convictions over the prior ten years would have been admissible in the Commonwealth's rebuttal case regardless of whether appellant presented character witnesses. *See* 42 Pa.C.S. §5918; Pa.R.E. 609(a), (b). Thus, the court reasoned, counsel was required to weigh the benefit of the character evidence against only the non-*crimen falsi* offenses of disorderly conduct, contempt and drug offenses. The court concluded "it is inconceivable the incremental revelation of these additional offenses would have caused a reasonable juror to change his or her opinion regarding [appellant's] culpability." PCRA Court Op. at 14.

Since the underlying claim of trial counsel's ineffectiveness is record-based, it could have been raised on appeal, and that iteration of the present claim is waived. In addition, in assessing trial counsel's conduct for the derivative claim of appellate counsel's ineffectiveness, we initially note the discovery provided in this case included a sheet of charges which did not indicate the formal dispositions on those charges. At the time of appellant's trial, character witnesses could not be cross-examined about a defendant's prior arrests which did not result in convictions. *See Commonwealth v. Keaton*, 45 A.3d 1050, 1073 (Pa. 2012), *citing Commonwealth v. Scott*, 436 A.2d 607 (Pa. 1981). Thus, contrary to appellant's claim, review of the discovery material would not necessarily have been a dispositive factor in trial counsel's decision whether or not to proffer the witnesses, and counsel may have deemed that reason enough to accept

appellant's averment he only had one prior conviction. *See Strickland,* 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). When the facts supporting a strategy or defense are known to counsel primarily based on his client's representations, "the need for further investigation may be considerably diminished or eliminated altogether." *Id.*

On the other hand, it is a relatively simple matter to investigate further and determine the precise circumstances of appellant's prior record. Here, counsel is deceased and little, if anything, could be accomplished by remand for an evidentiary hearing to determine what appellant told him. For present purposes, it is enough that the record provides some support for counsel on appeal to have included this in his claims of trial counsel's ineffectiveness. Notably, as to this iteration of his claim, appellant simply declares appellate counsel "could have no reasonable basis for not including this claim" on appeal, Appellant's Brief at 50, and no proffer was made below respecting appellate counsel's strategic decisions in preparing the appeal.

In any event, even assuming counsel had no strategic reason not to include this claim in addition to, or instead of, other claims pursued, we are aligned with the PCRA court's conclusion no *Strickland/Pierce* prejudice resulted from trial counsel's lapse and that in turn suggests the issue was not worth pursuing. As appellate counsel no doubt realized, the law recognizes juries are presumed to follow instructions. *See Commonwealth v. Hoover*, 107 A.3d 723, 731-32 (Pa. 2014) (jury specifically instructed prior conviction was not evidence of guilt and jury was required to consider evidence for limited purpose of judging credibility and weight of witness's testimony; juries are presumed to follow instructions). The trial court instructed the jury as follows:

> Now, you will recall that as to [appellant] the District Attorney was
> permitted to cross-examine [the witnesses] for one purpose only, and that

was for the purpose of providing evidence which might help you judge whether [appellant's] character witnesses are really familiar with his reputation and whether in their testimony they gave you an accurate description of his reputation. You will recall those questions dealt with some offenses that [appellant] has been convicted of, and that's part of my recollection. It's your recollection that controls.

The evidence brought out by the District Attorney's cross-examination must not be considered by you in deciding whether [appellant] is guilty or not guilty in any way other than for the one purpose that I have just stated. In particular, I caution you that you must not consider the evidence as proof that [appellant] is a person of bad character or has committed the crimes charged or any other offense.

N.T. 3/9/94 at 132. In our view, the PCRA court did not err in determining that appellant failed to prove trial level prejudice; consequently, appellant's derivative claim of appellate counsel's ineffectiveness must fail as counsel cannot be deemed ineffective for failing to raise a meritless claim. *See Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015).

### B. Penalty phase

The guilt phase evidence was incorporated into the penalty phase at trial and appellant testified in his own defense at the penalty hearing. Among other things, he testified his criminal record for burglary and drug offenses occurred when he was young and impressionable, and he pleaded guilty to those offenses and received probationary sentences. He testified he was a bricklayer and continued to maintain his innocence, telling the jury, "y'all convicted two innocent young men." N.T. 3/11/94 at 56. Appellant also presented two witnesses at the penalty hearing who testified he was hard-working, a good father and did not have a drug problem; the prosecutor cross-examined appellant's witnesses regarding their knowledge of his criminal history and drug use.

Appellant alleges trial counsel was ineffective for failing to object to incorporation of the guilt phase evidence, as the other-crimes evidence amounted to the admission of

a non-statutory aggravating circumstance. Appellant asserts the introduction of evidence of his general criminal history and drug use prejudiced him because the Commonwealth could not directly seek the 42 Pa.C.S. §9711(d)(9) aggravating circumstance as appellant did not have an extensive history of violent felonies. Appellant argues the evidence against him "was not overwhelming" and "[t]hus, it was critical for the jury to find [a]ppellant credible when he testified on his own behalf at guilt and penalty." Appellant's Brief at 49. The introduction of his criminal history prejudiced him, he asserts, as it impeached his credibility and "made it easy for the jury to believe [appellant] fired the shots instead of [codefendant], who did not have an extensive criminal history." Id. Appellant additionally claims appellate counsel was ineffective for failing to raise these record-based issues on direct appeal. Appellant cites no Pennsylvania decisional precedent to support his claim the evidence amounted to the admission of a non-statutory aggravating circumstance.

The Commonwealth responds the trial court's sentencing instructions made clear to the jury the only applicable aggravating circumstance was a killing committed during the perpetration of a felony (here, robbery). The PCRA court determined it was proper for the prosecutor to impeach appellant regarding his criminal history and drug use as those areas were probed on direct examination. The court also determined it was proper for the prosecutor to impeach appellant's mitigation witnesses about his drug use because both testified he had no drug problem. The court further held "there was no improper attempt to use [appellant's] record as a non-statutory aggravator," and thus, "any objection made on that ground would have been meritless." PCRA Court Op. at 15.

We discern no error in the PCRA court's resolution. The trial court instructed the jurors there was only one applicable aggravating circumstance for them to consider:

whether "[appellant] committed a killing while in the perpetration of a felony. …[T]he felony referred to is the robbery." N.T. 3/11/94 at 89. The court also instructed the jury regarding the parties' relative burdens of proof and the need for juror unanimity to impose a death sentence. There was no claim on direct appeal (or now) alleging the court's charge to the jury in this respect was erroneous.

A claim of trial counsel's ineffectiveness in failing to object to the incorporation of the guilt phase evidence into the penalty phase could have been raised on direct appeal, but was not, and is thus waived under the PCRA. Moreover, even absent the default, given the court's proper instructions, which made clear only one aggravating circumstance was at issue, and appellant's failure to support his present claim by citation to any relevant cases, the claim of trial counsel's ineffectiveness has not been substantiated.

Furthermore, appellant's claim he was prejudiced in both phases of the trial because his criminal history impeached his credibility in a close case is undermined by the substantial evidence of his guilt, and the court's instruction to the jury the evidence was not to be used to determine guilt or innocence or to determine the penalty. Thus, appellant's derivative claim of appellate counsel's ineffectiveness fails.


## VI. Evidence connecting appellant to the plot to murder Tanesha Robinson (and ineffectiveness overlay)[12]

Trial counsel's motion for a mistrial, made when the prosecutor referenced the triple-killing in his opening statement at trial, was denied by the court. The court also

---

[12] Although this claim is presented as issue 6 in appellant's "Statement of Questions Involved," the argument in support of the claim is the first argument presented in appellant's brief.

overruled counsel's hearsay objection to Buigi's testimony stating appellant admitted he had a role in the triple-killing.

On direct appeal, appellant claimed admission of the evidence of the triple-killing rendered his trial fundamentally unfair and counsel was ineffective for failing to make objections on grounds of undue prejudice and insufficient proof. In support thereof, appellant argued the prejudicial impact of the evidence outweighed its probative value, and maintained Buigi's testimony was incredible and should have been excluded. On direct appeal, appellant conceded counsel made a motion for mistrial and posed a number of objections respecting the evidence, but argued counsel was ineffective for failing to make "appropriate objections." Brief for Appellant on Direct Appeal at 29, *Hannibal*, 753 A.2d 1265 (Pa. 2000), *available at* 1997 WL 33544659. Appellant did not present an analysis of counsel's performance by specific reference to the *Strickland/Pierce* prongs on direct appeal, but baldly asserted it was incumbent on trial counsel to renew his motion for a mistrial, and counsel had no possible strategic basis for failing to press every available objection to the challenged evidence; appellant further claimed counsel's lack of reasonable basis for his actions or inactions was obvious, as was the prejudice flowing therefrom. *Id.* at 28-29. In a footnote, this Court rejected the claims because appellant failed to set forth or meaningfully discuss the three-pronged ineffectiveness standard, and because the challenged evidence was relevant and admissible to show the history of the case and to prove consciousness of guilt in any event.[13]

---

[13] This Court specifically stated:

(continued…)

Appellant now claims admission of the evidence concerning his involvement in Robinson's murder denied him his rights to due process and a fair trial, and prior counsel were ineffective to the extent they failed to litigate the issue. Appellant's Brief at 13, 16-23, 24-26. Appellant alleges the evidence, which was primarily based on Buigi's testimony, should have been excluded because Buigi was an unreliable witness, and counsel should have objected to the evidence on that basis. The PCRA court determined the guilt phase claims challenging the admissibility of evidence regarding the Robinson murder and counsel's alleged ineffectiveness for failing to object to that evidence are not cognizable under the PCRA because they were previously litigated and resolved against appellant on the merits by this Court on direct appeal. We agree the claim is subject to the statutory prior litigation bar. Appellant has failed to articulate any material difference between the instant claim of a due process violation resulting in an unfair trial and the substantive claim raised and rejected on direct appeal. On direct

---

(…continued)

> Hannibal claims his trial was unfair because evidence of the murder of Tanesha Robinson, a witness, was admitted into evidence and that trial counsel was ineffective for failing to object to the introduction of evidence that Hannibal was linked to the murder of Tanesha Robinson.
>
> This claim [also] fails for a number of reasons. First the trial court did not err in admitting this evidence since it is part of the history of the case. Second the claim of ineffectiveness fails because Hannibal again fails to set out the three pronged test for ineffectiveness of counsel. Third, there was no basis to object to the evidence because it was admissible to show Hannibal's consciousness of guilt. *Commonwealth v. Goldblum*, [447 A.2d 234 (Pa. 1982)] (evidence that appellant agreed to pay undercover operative to kill witness is admissible to show consciousness of guilt). Therefore, the trial court did not err in admitting this evidence, and defense counsel was not ineffective for failing to object to the admission of this evidence.

*Hannibal*, 753 A.2d at 1272, n.11.

appeal, this Court dismissed appellant's substantive claim of unfairness resulting from alleged trial court error in its evidentiary rulings, and his derivative ineffectiveness claim for failure to challenge the admissibility of the challenged evidence on particular grounds, including Buigi's alleged lack of veracity. The gravamen of appellant's claim then and now is, in part, the same — Buigi was such an unreliable witness his testimony linking appellant to the triple-killing should have been precluded and counsel was ineffective for failing to raise that claim. Thus, we dismiss the present iteration of the claim as previously litigated. *See* 42 Pa.C.S. §9544(a)(2). [14]

Appellant further claims counsel were ineffective during the penalty phase for failing to challenge the evidence of Robinson's murder on grounds it violated the Eighth Amendment, denying him a reliable sentencing determination. Appellant's Brief at 20-23. Specifically, appellant claims the sentencing determination was not reliable because the jury was free to consider his involvement in Robinson's murder, which the

---

[14] In her concurring opinion, Justice Todd disagrees the issue has been previously litigated, because although the claim was raised on direct appeal, this Court misapprehended the issue to such an extent there was no merits ruling. In our view, this Court's brief discussion of the issue on direct appeal was, nevertheless, a merits disposition and holding. The Court properly stated the substantive issue was whether appellant received a fair trial. Although the Court did not set forth appellant's arguments in detail, it nevertheless clearly identified and implicitly rejected the substantive claim of an unfair trial based on the court's allegedly erroneous evidentiary rulings with respect to the triple-killing, and it explicitly rejected appellant's arguments with respect to counsel's ineffectiveness because they were not supported by the necessary legal analysis. *Hannibal*, 753 A.2d at 1272, n.11. This Court's analysis of the issue on direct appeal, while perhaps less than extensive, was nevertheless certain in its dispositive effect, and we reject appellant's current iteration of the claim as previously litigated. In his dissenting opinion, Chief Justice Saylor states he would remand for a new trial because, in his considered judgment, trial counsel was ineffective for failing to secure from the trial court a determination the probative value of the evidence of the triple killing was outweighed by its prejudicial impact. Dissenting Slip Op. at 5. Notably, appellant has not raised that issue in this appeal.

prosecutor commented upon in summation, as a non-statutory aggravating circumstance. To further support his claim, appellant challenges what he says was the trial court's confusing penalty phase instruction regarding the jury's consideration of the evidence of Robinson's murder. The court instructed the jury:

> In considering the evidence that was presented at the earlier trial, you will recall that the concern of the three young ladies was limited in your consideration to an effort to show consciousness of guilt. These defendants are not on trial for anything that happened to those three young ladies. Your decision as to sentence must be based on the evidence that was presented concerning the death of Mr. LaCourt.

N.T. 3/11/94 at 92-93.

The Commonwealth and the PCRA court posit appellant's claim based on the penalty phase instruction is waived as it could have been challenged at trial and raised on direct appeal. As for appellant's derivative claims of counsel ineffectiveness, appellant's reading of the jury charge as inviting consideration of an extra-statutory aggravator is unpersuasive. We see nothing so obviously confusing about the instruction regarding the jury's consideration of the evidence of the triple killing that counsel were required to discern an Eighth Amendment objection. The court properly instructed the jury it could consider the evidence only for the limited purpose of showing appellant's consciousness of guilt. *See Commonwealth v. Hairston*, 84 A.3d 657, 664 (Pa. 2014) (defendant not charged with arson but evidence he intentionally set fire to house after murdering people inside admissible to show consciousness of guilt).

In further support of his claims, appellant asserts Terrence Richardson later recanted his testimony he was with individuals who received money to murder Robinson in order to silence her. Appellant also argues Frederick Daughtry (codefendant Gregory's coconspirator in the murder of Robinson, who pleaded guilty to murder in 1997) provided an affidavit in 2000 stating her murder had not been motivated by a

desire to prevent her testimony. In a later affidavit, Daughtry averred appellant had nothing to do with Robinson's murder. Appellant now alleges he was denied due process because Daughtry's initial affidavit was allegedly withheld by the prosecution at the time of his direct appeal, violating the Commonwealth's continuing *Brady* obligation. Appellant asserts, at the least, he is entitled to a hearing on this issue.

The Commonwealth responds that, to the extent appellant claims evidence discovered after his trial raises doubts about the strength of the trial evidence, the claim is waived because appellant did not present any argument to the PCRA court to satisfy the demanding standards governing a claim of newly discovered evidence (discussed below). The PCRA court noted the claims regarding Daughtry's affidavit and Richardson's recantation were not raised in the PCRA court and cannot be raised for the first time on appeal from the denial of PCRA relief. Moreover, even had the claims been properly raised, the court found them meritless: Daughtry stated in his affidavit he would refuse to testify if called as a witness in any further proceedings and, although Richardson recanted his testimony in a post-trial hearing in codefendant's case, the judge in that case, who also presided over this trial (Judge Clarke) found the recantation to be incredible. *See* PCRA Court Op. at 18. The PCRA court concluded the new evidence was not of a nature or character to warrant relief and dismissed the related claims without a hearing.

Our review of the record shows claims regarding Daughtry's affidavit and Richardson's recantation in fact were raised in the amended petition filed in 2005. *See* Appellant's Amended PCRA Petition, 9/7/05 at 27-28. The PCRA provides relief for a petitioner who demonstrates his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced."

42 Pa.C.S. §9543(a)(2)(vi). To establish a newly discovered evidence claim under the PCRA, it must be shown the evidence: (1) was discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) is not cumulative; (3) is not being used solely to impeach credibility; and (4) would likely compel a different verdict. *Commonwealth v. Washington*, 927 A.2d 586, 595-96 (Pa. 2007). Newly discovered evidence must be producible and admissible to entitle a petitioner to relief. *Commonwealth v. Castro*, 93 A.3d 818, 825 (Pa. 2014).

Daughtry executed two affidavits; the first dated February 8, 2000, the second dated September 2, 2005. In the first, he averred he lied at codefendant Gregory's separate trial for the murders of the three females. He stated that, in exchange for his perjured testimony implicating his codefendants, he "received 15 to 30 years for a charge of third degree murder" for his involvement as a "look out man" in the crime. Daughtry Affidavit, 2/8/00. He further asserted the murder of Tanesha Robinson "was not in retaliation for witnessing another murder[.]" *Id.* Notably, however, he also averred he did "not wish to give further testimony[,]" and if called as a witness, he "will invoke [his] Fifth Amendment right to not testify." *Id.* In his second affidavit, Daughtry averred "Sheldon Hannibal had nothing to do with … the killings of Tanesha Robinson, LaToya Cook and Jeanie Robinson[,]" and the murders "had nothing to do with anybody being a witness in another case or anything like that. It was just a burglary that went really wrong." Daughtry Affidavit, 9/2/05.

With respect to Richardson, the record contains no documentation to support the allegation he recanted his testimony against appellant in a post-trial hearing related to codefendant's separate charges for the murder of the three females, other than the PCRA court's acknowledgement the recantation took place. Thus, Richardson apparently recanted his trial testimony in codefendant's separate trial, not in a

proceeding pertaining directly to appellant, and Richardson's recantation is not contained in the certified record on appeal. Similarly, Daughtry's first affidavit does not mention appellant at all, and it is clear it was presented in proceedings pertaining to appellant's codefendant.

Significantly, both Richardson's and Daughtry's statements, upon which appellant now relies to support his claims he did not receive a fair trial, sentencing proceeding or appeal, involve admissions of lying under oath in court proceedings. It is well-settled recantation evidence is notoriously unreliable, and where it involves an admission of perjury, it is the least reliable source of proof. *Commonwealth v. Henry*, 706 A.2d 313, 321 (Pa. 1997). *See also Commonwealth v. Clark*, 961 A.2d 80, 87 n.6 (Pa. 2008) (noting inherent unreliability of recantation evidence and reasonableness of strategic decision by counsel to forego its presentation). Notably, appellant has not cited to, or presented argument regarding, the requirements to establish PCRA relief on a claim of newly discovered evidence, including that the new evidence would be admissible (as opposed, for example, to Daughtry's declaration he would assert a privilege not to testify). Nor has he explained how the new evidence here was such that it would likely compel a different verdict if presented. Appellant's suggestion of a *Brady* violation is also unsupported by pertinent argument or authority and lacks any substantiated showing the recantations were suppressed, were exculpatory and their non-disclosure resulted in prejudice.

For these reasons, we determine the PCRA court did not err in denying, without an evidentiary hearing, the underlying claims of a constitutional violation and the derivative claims of counsel's ineffectiveness.

## VII. Mitigating mental health evidence (and ineffectiveness overlay)

Appellant claims trial counsel was ineffective for failing to investigate and present significant mental health mitigating evidence at the penalty proceeding. He also alleges appellate counsel was ineffective for failing to investigate and discover such evidence to "properly raise the issue of trial counsel's ineffectiveness" in this regard on appeal. Appellant's Brief at 52. Appellant's underlying claim, in essence, is premised on the belief he has borderline intelligence and suffers from organic brain damage; he says if those facts had been presented to the jury during the penalty phase, "at least one juror would have voted for life." *Id.* at 59.

As noted, the PCRA court conducted a hearing on this claim at which three expert witnesses in neuropsychology testified, Dr. Armstrong and Dr. Crown for appellant, and Dr. Swirsky-Sacchetti for the Commonwealth. All three experts agreed the records existing at the time of appellant's trial reasonably showed further neuropsychological testing was indicated, and the PCRA court consequently determined there was arguable merit in the underlying claim of trial counsel's ineffectiveness for failing to further investigate appellant's mental health as a potential mitigating factor.

At the hearing, the focus was whether appellant suffered from a cognitive disability that might be seen as mitigating under the "catch-all" category of mitigating circumstances. *See* 42 Pa.C.S. §9711(e)(8) ("any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense"). No expert witness opined appellant had a substantially impaired capacity to appreciate the criminality of his conduct or conform his conduct to requirements of the law, or was under extreme mental or emotional disturbance at the time he committed the crime, so as to implicate specific mental health mitigators. *See* 42 Pa.C.S. §9711(e)(2), (e)(3). The experts' opinions differed sharply as to whether appellant

suffered from any cognitive disability, calling for the court to make a factual determination.

Dr. Armstrong evaluated appellant on January 14, 2008, conducting a battery of tests to determine whether he suffered from neuropsychological impairments. The tests were broadly categorized into seven domains of mental functioning: motor functioning, processing speed, attention, verbal memory, language, visuospatial processing and memory, and intellectual processes and executive functions. She testified to her opinion appellant had "impairments in all of the domains[,]" some of which were "severe," which "raised the possibility [appellant] had intellectual disability." N.T. 7/28/14 at 87, 90. She did not conduct a full-scale IQ test, but was aware Drs. Crown and Swirsky-Sacchetti had conducted IQ tests; appellant received a full-scale IQ of 79 on the test administered by Dr. Crown and a full-scale IQ of 74 on the test administered by Dr. Swirsky-Sacchetti. Dr. Armstrong testified "intellectual disability … which we used to call mental retardation, but no longer do[,] … is now defined as an IQ around 70 or 75." *Id.* at 91.

Dr. Armstrong further suggested appellant may suffer from brain damage:

Q. [By appellant's attorney]: Okay. And so your overall conclusions from all these testings, the tests you did, do you make an actual diagnosis of brain damage?

A. Well, in a sense, yes. I make maybe not a medical diagnosis, but I'm making the diagnosis that he has enough signs of brain dysfunction that it's real, that there is a disturbance of the brain[.]

*Id.* at 106-07.

On cross-examination, Dr. Armstrong clarified she "inferred" the existence of a "brain injury," which she characterized as "poor development of the brain," the cause of which was unknown, but could be due to "a genetic code" or "something he acquired,

something in the environment, we don't know." *Id.* at 239. She further opined appellant's organic brain impairments were long-standing because he could not read as a child and into his teenage years, and the failure to learn to read at an early age can cause permanent detrimental effects on the brain. Dr. Armstrong also opined appellant suffers from an unspecified "learning difficulty." *Id.* at 136.

She further testified she has consulted on sixty capital cases, all for the defense, is familiar with the "statute on mitigations scheme in Pennsylvania[,]" and she believed appellant's unspecified learning disability "would be a very important potential mitigator." *Id.* at 136-37. Specifically, Dr. Armstrong opined the mitigating aspects of appellant's mental condition under the catch-all section (e)(8) were as follows:

> So having neuropsychological impairments that are severe and significant and low intellectual ability combined together to affect a person in everyday life, because there are many situations that they don't understand the full aspects of and don't remember - and that's important - affects how much they can learn from their experiences, that it affects their ability to understand a consequence of something that they do. They can't reason kind of beyond their experience at the time and it will cause them to make incorrect judgments. They'll also not understand how to interact with authority figures sometimes and because they won't understand kind of the consequences of answering, you know. They just want to please and will just want to give an answer that's either most automatic for them or that they think might be expected. They have a high risk of being misinterpreted by others because they're not understanding and so they're giving answers that may not fit in and they may not be remembering things that you thought that they remembered. And they can be difficult to work with by counsel, certainly, but other people will have difficulty understanding them as well. And so they're often misrepresented in that sense, in that sense of not being able to represent themselves clearly. They can be taken advantage of easily by others because of their psychological impairments, and they generally need a very well structured environment and a lot of, you know, well-meaning adult guidance in order to be able to find a stable lifestyle and to live as independently as possible.

*Id.* at 137-39.

Dr. Crown testified he tested appellant's IQ in March 2009. After noting "[mental] retardation technically begins at below 70," he testified appellant's IQ score of 79 placed him at the eighth percentile of intelligence, meaning 92% of persons have a greater IQ score. N.T. 7/29/14 at 19. He also testified IQ remains relatively stable throughout life, and appellant's IQ at the time of the crime would have been roughly the same, absent some intervening injury, of which there was no evidence.[15] He testified there is a 95% probability appellant's IQ lies somewhere between 74 and 79, and, in sum opined "this is a gentleman who has a low IQ and it would be classified as borderline. It's not going to move below that 70 marker." *Id.* at 26.

Dr. Crown testified he has been retained as a consultant in a number of capital cases in which intellectual disability was at issue, is familiar with the *Atkins* and *Hall* cases, and appellant does not have an "intellectual disability" in terms of diagnosis and definition. *See Atkins v. Virginia*, 536 U.S. 304 (2002) (Eighth Amendment to United States Constitution prohibits imposition of the death penalty upon "mentally retarded criminals"); *see also Hall v. Florida*, __ U.S. __, 134 S.Ct. 1986 (2014) (phrase "mentally retarded" no longer widely used professionally; "intellectual disability" is preferred phrase to describe same constellation of symptoms). He noted he did not conduct any neuropsychological testing of appellant, but reviewed the tests and summaries conducted by the other expert witnesses in this case. He opined those results demonstrated appellant suffers from a "neuropsychological impairment that's likely to have had its origins in the developmental period." N.T. 7/29/14 at 35. He testified the neuropsychological impairment was not the result of a traumatic head injury, but was

---

[15] Dr. Crown interviewed appellant in January 2013 to determine whether there had been an intervening illness or trauma, and found none.

likely in the nature of organic brain damage of unknown etiology "related to metabolic changes, possible problems in neonatal development, possible fetal development problems, possible problems with nutrition or food absorption particularly during the first three years of life, possible earaches, possible high fevers during that period, and I'm talking about up to the time that we begin to use language. So it would be pre[-]language." *Id.* at 39. There were no records or tests showing any of the possible causal circumstances actually existed in appellant's neo-natal and early developmental years, and the testing included no imaging studies of appellant's brain such as CT scans or MRIs.

Dr. Crown explained that a neuropsychological examination is a measure of the functional capacities to perform various tasks, as opposed to an IQ test which relates to cognition, *i.e.*, the ability to process knowledge and information. He testified that neo-natal and early organic brain injury, unrelated to traumatic head injury, present early in life and can result in a person having functional strengths and weaknesses. Here, the testing showed appellant demonstrated problems with "reading going back to his days entering the schools in Philadelphia and in the Job Corps. He's reading at the third grade level. But he is relatively good in contrast with mathematical manipulations, operating at the seventh grade level[.]" *Id.* at 40. He opined that appellant's illiteracy as an adolescent raises red flags indicating the need for neuropsychological testing to answer the question "why can't this person read?" *Id.* at 45. Ultimately, Dr. Crown opined that appellant's combination of low IQ affecting cognitive abilities, and his organic brain damage affecting functional abilities, were mitigating circumstances.[16]

---

[16] Specifically, Dr. Crown testified the cognitive deficits of persons with a "low IQ" were mitigating as follows:

(continued…)

On cross-examination, Dr. Crown testified he read appellant's Job Corps report from the U.S. Department of Labor indicating appellant completed the brick masonry program, received above average evaluations and completed job assignments with little supervision. He also testified appellant told him he reads the Bible, and Dr. Crown admitted, "his reading has significantly improved, yes." *Id.* at 130.

In rebuttal, Dr. Swirsky-Sacchetti testified he performed a neuropsychological examination (which included a full-scale IQ test) of appellant and reviewed the raw data and results of Dr. Armstrong's neuropsychological examination and Dr. Crown's test of appellant's IQ. Asked to give his professional opinion of Dr. Armstrong's conclusion appellant suffered from an organic brain injury, he disagreed with that conclusion,

(…continued)

> They tend to be more concrete. They tend not to be able to make critical analyses. They have difficulties with what I refer to as language-based critical thinking, those if-then consequential statements that you make to yourself. And you have more difficulty in making meaning out of the experience of your environment. You have greater difficulties in, by the very nature of intelligence, thinking rationally and also in dealing purposefully with situations. And that's the nature of intelligence. That's Wechsler's definition of intelligence. So those are the underlying characteristics.

N.T. 7/29/14 at 104. With respect to mitigating aspects of organic brain damage, Dr. Crown testified:

> They … include things like concentration, attention, memory, self-assessment, the ability to read facial expressions, the ability to modulate the tone of your voice to someone else's voice, the ability to see things in temporal space, the ability to act and associate seeing something with words to explain it and vice-versa, shifts between the right and left hemispheres of the brain, and the ability to modulate and control impulsivity.

*Id.* at 107.

testifying there is "nothing to support it both in terms of history and in terms of the test data." N.T. 7/31/14 at 25. He also disagreed with Dr. Armstrong's conclusion the failure to learn to read at an early age has permanent effects on the brain. He agreed preliminary research indicates non-exposure to reading at an early age can result in structural changes in the brain, specifically in an area known as the angular gyrus. However, "in the very articles Dr. Armstrong quoted, she failed to say that those physical or structural changes in the brain can be reversed[.]" *Id.* at 26. Thus, he "disagree[d] with her use of the word permanent" because the research upon which she relied to reach that conclusion does not support it. *Id.* at 27.

Dr. Swirsky-Sacchetti also criticized Dr. Armstrong's failure to conduct a full-scale IQ test at the time she conducted her neuropsychological examination of appellant "as a very dangerous shortcut in a case like this" because the examiner "runs the risk of over-interpreting the weak findings." *Id.* at 27, 28. This risk is because cognitive functionality is related to IQ: in someone with a superior IQ, an examiner would expect to see superior results in areas such as memory, problem solving, motor speed and language, while the expected results in those categories would be diminished in someone with a lower IQ. Dr. Swirsky-Sacchetti testified the full scale IQ test is "very important to measure any kind of organic brain dysfunction." *Id.* at 29.

Dr. Swirsky-Sacchetti further criticized Dr. Armstrong's administration of a number of the individual components of the neuropsychological test she conducted. For example, he criticized the way she administered the Wisconsin Card Sorting Test, which is designed to measure abstract reasoning and mental flexibility using a deck of 128 cards from which the subject is instructed to deduce patterns or categorical similarities. The test is one in which the examiner would expect better results the longer the test

goes on. Dr. Swirsky-Sacchetti criticized Dr. Armstrong for using only 64 cards to conduct the test:

> This is another area where I thought Dr. Armstrong was seriously cutting corners because this is a very complicated test of executive functioning. It's been demonstrated that people who are of lower average intelligence often have difficulty with this test without any brain damage. Normal community-residing adults with lower IQs can fail this test. And what she does is she cuts it in half.

*Id.* at 46.

Dr. Swirsky-Sacchetti added that Dr. Crown made several scoring errors when computing appellant's IQ at 79, which when corrected, would adjust appellant's IQ to 80. He further testified a subject's best performance is most reflective of true IQ absent wide variations in results. He testified the change in score from 79 to 80 is "not a big difference" but is notable because it changes appellant's category of intellectual functioning from the borderline range to low average intelligence range. *Id.* at 50. In sum, Dr. Swirsky-Sacchetti testified he disagreed with Dr. Crown's opinion appellant had borderline intelligence and brain damage.

Dr. Swirsky-Sacchetti instead opined appellant has no brain damage. He noted appellant may have some level of dyslexia characterized by trouble with reading, but that condition was unrelated to problems with overall intelligence or brain damage. He further explained there was no indication any alleged malformation of the angular gyrus, the area of the brain associated with reading and writing, occurred in appellant's early developmental years. Moreover, he testified appellant's lowest scores in the IQ test he administered were in areas that tested fund of information, knowledge base and vocabulary, all of which correspond very highly with a person's level of education. Thus, in his view, the results were not surprising given appellant's lack of education.

Faced with these opposing expert views, the PCRA court credited Dr. Swirsky-Sacchetti's testimony, noting it was persuasive and supported by the record, while the testimony of Dr. Armstrong and Dr. Crown was not credible. The court determined that had the evidence at the PCRA hearing been presented to the jury during the penalty phase, along with the other mitigation evidence actually offered, "it is not reasonably probable that at least one juror would have found the ([e])(8) catch-all mitigator" applied. PCRA Court Op. at 26. The court further opined, "[a]ssuming arguendo, that one or more jurors would have found the (e)(8) mitigator, …it is not reasonably probable that at least one juror would have assigned weight to that mitigator equal to, or greater than, the aggravator found by the sentencing jury." *Id.* Thus, the court determined appellant "was not prejudiced by trial counsel's failure to investigate and elicit additional testimony regarding [appellant's] mental health impairments." *Id.* The court therefore dismissed the ineffectiveness claim, concluding no relief was due.

We see no error in the PCRA court's determination. Preliminarily, we note, despite Dr. Armstrong's opinion that appellant may be "intellectually disabled," no claim is made that appellant's sentence of death violates constitutional proscriptions against execution of the intellectually disabled as set forth in *Atkins*, *Hall*, and *Commonwealth v. Miller*, 888 A.2d 624 (Pa. 2005). Nor did appellant attempt to establish, through his expert witnesses at the PCRA hearing, he suffers from intellectual disability as those conditions are diagnosed under the standards set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) (DSM-IV) or the American Association of Mental Retardation (AAMR), now the American Association on Intellectual and Developmental Difficulties (AAIDD). *See Commonwealth v. VanDivner*, 130 A.3d 676, 681 (Pa. 2015) (PCRA petitioner may establish his or her mental retardation under either classification system). Instead, he questions whether the jury would have

returned a different penalty verdict if it had heard testimony along the lines of what was produced at the PCRA proceeding.

With respect to appellant's alleged organic brain damage, there was no medical history or other documentation to show any of the possible causal circumstances testified to by Drs. Armstrong and Crown actually existed in appellant's neo-natal and early developmental years; moreover, there were no imaging studies of appellant's brain. There was no evidence appellant had ever complained of or been treated for any brain injury. He had never been diagnosed with brain damage prior to the results of the instant neuropsychological testing. All experts agreed it did not appear appellant ever suffered any traumatic external blow to the head resulting in brain damage. Moreover, the history included reports showing appellant followed work instructions and completed brick-laying projects or assignments satisfactorily. In short, the evidence of a long-standing significant organic brain injury, or any other brain injury, was not substantial. Importantly, Dr. Swirsky-Sacchetti criticized the conclusions of appellant's experts and opined appellant had no brain damage, an opinion the PCRA court ultimately credited.

To the extent resolution of this issue depends upon the quality of the competing evidence, this Court is bound by a PCRA court's credibility determinations when there is record support for them. *See Commonwealth v. Williams*, 846 A.2d 105, 112 (Pa. 2004). In *Williams*, on appeal from the denial of PCRA relief in a capital case, we determined the appellant's claim of trial counsel's ineffectiveness for failing to present significant mental health mitigation evidence had arguable merit and counsel had no reasonable basis for failing to investigate and present the evidence. Nevertheless, we dismissed the claim on the basis appellant could not establish prejudice, noting "[i]t is evident from the [PCRA] court's opinion that it made credibility determinations as to the

testimony of the mental health experts, and resolved the issue against [a]ppellant." *Id.* at 113.

The situation here is similar to *Williams* in that the PCRA court made credibility determinations regarding the testimony of the expert witnesses, which are supported by the record (particularly insofar as the Commonwealth's expert explained his reasons for disagreeing with appellant's experts). Moreover, the existence of a mitigating mental health condition (organic brain damage) was somewhat speculative here; even its expert proponents admitted its existence was inferential.

Of course, we recognize appellant would have presented his mental health expert evidence to a jury, notwithstanding its strength or issues of credibility, leaving the question for the jury. Nevertheless, in the collateral attack scenario, where a *Strickland* assessment of prejudice is at issue, the PCRA court's credibility findings are consequential, as *Williams* recognized. For purposes of assessing *Strickland* prejudice here, the question is whether appellant has shown a reasonable probability, had the mitigation evidence adduced at the PCRA hearing also been presented at the penalty phase, the outcome of the proceedings would have been different because at least one juror would have found the catch-all mitigating circumstance and would have proceeded to conclude it outweighed, or was as weighty as, the aggravating circumstance, so as to convince a juror to find the overall quality of the case in mitigation warranted a sentence of life in prison. *See Daniels*, 104 A.3d at 303-04. The PCRA court, which heard the new case in mitigation, and had the trial record before it, answered this question in the negative based in part on an assessment of the credibility and strength of appellant's new evidence. The court's assessment of prejudice is supported by the record.

Accordingly, while the record shows that trial counsel's performance in failing to investigate and present mental health evidence was deficient, appellant's layered claims

of counsel's ineffectiveness were properly dismissed by the PCRA court on *Strickland/Pierce* analysis grounds, in that it is not reasonably probable the outcome of the penalty proceeding would have been different had the contradictory expert evidence been presented to the jury.

## VIII. Aggravating circumstance

Appellant asserts the Commonwealth did not prove the single aggravating circumstance — 42 Pa.C.S. §9711(d)(6) (killing committed during perpetration of felony) — beyond a reasonable doubt because it did not present sufficient evidence to show he was the shooter. Appellant argues the Commonwealth proceeded on a theory of accomplice liability and the trial evidence "left open the real possibility that [a]ppellant was at most an accomplice rather than the actual killer, and consequently, that the (d)(6) aggravating circumstance was invalid." Appellant cites *Commonwealth v. Lassiter*, 722 A.2d 657, 662 (Pa. 1998) (Opinion Announcing Judgment of Court (OAJC), for the proposition that, "Section 9711(d)(6) may not be applied to an accomplice." Appellant's Brief at 63.[17] Appellant claims trial counsel was ineffective for

---

[17] Although the lead opinion in *Lassiter* was a plurality, with a fourth Justice concurring in the result, the three-Justice dissenting opinion by then-Justice, now-Chief Justice Saylor, agreed a prosecution for murder based on accomplice liability cannot support the (d)(6) aggravating circumstance. *Lassiter*, 722 A.2d at 664 (Saylor, J., concurring, joined by Flaherty, C.J., and Zappala, J.). The issue presented itself in *Lassiter* in a non-capital guise: Lassiter waived her right to a jury trial in exchange for the Commonwealth's promise not to seek the death penalty; she was convicted of second-degree murder and her life sentence was affirmed on direct appeal; and she later claimed on PCRA review that trial counsel was ineffective because the Commonwealth's promise not to pursue the death penalty was illusory consideration given the strong argument that the aggravator did not apply to accomplices. The *Lassiter* Court agreed on the scope of the aggravator, with the division on the Court centering on the question of prejudice.

failing to challenge application of the aggravating circumstance on this basis and appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness.

The Commonwealth responds *Lassiter* was decided four years after appellant's trial and this Court has held counsel cannot be deemed ineffective for failing to anticipate *Lassiter's* holding. Appellee's Brief at 68-69 (citing cases). Moreover, the Commonwealth maintains *Lassiter* "would have been inapplicable in any event because [appellant] was tried and sentenced as the principal killer, not as an accomplice." *Id.* at 68. The PCRA court echoes the Commonwealth's response and adds that, on direct appeal, this Court determined the evidence was sufficient to prove appellant killed the victim.

*Lassiter* makes clear the pertinent aggravating circumstance applies only to principals, not accomplices. The Commonwealth is correct that this Court has repeatedly held counsel cannot be deemed ineffective for not anticipating *Lassiter*. *See, e.g., Commonwealth v. Cox*, 983 A.2d 666, 702 (Pa. 2009); *Spotz*, 896 A.2d at 1238 (same). Moreover, the evidence at trial, including appellant's statements to Buigi admitting he shot and killed LaCourt during a robbery, was sufficient to support application of this aggravating circumstance, and so prior counsel cannot be faulted for failing to challenge it on this theory. There was no error in the PCRA court's dismissal of appellant's layered claim of counsel's ineffectiveness.


### IX. Joint penalty proceedings

Appellant claims he was denied an individualized sentencing determination because his penalty phase proceeding was joined with that of his codefendant, and the joint proceeding "injected irrelevant, non-statutory aggravation into the case in violation of [a]ppellant's rights to due process and a fair sentencing proceeding." Appellant's

Brief at 68. Appellant correctly notes codefendant presented evidence of four mitigating circumstances while appellant presented only two.[18] Appellant argues this difference allowed the jury to compare and decide the penalty based on which defendant presented more mitigation evidence. He then claims this circumstance helped to lessen the impact of appellant's presentation because codefendant had no criminal record, while appellant had numerous arrests and convictions; codefendant was seventeen-years-old at the time of the murder while appellant was twenty-years-old; codefendant's evidence at trial, if believed, tended to show his participation in the killing was relatively minor; and codefendant presented a greater number of character witnesses.

Appellant also argues "the penalty phase defenses" of appellant and codefendant "were irreconcilable and antagonistic" based on codefendant's claimed applicability of the (e)(7) mitigating circumstance that his participation was relatively minor. *Id.* at 69. Appellant posits, "The jury was implicitly told that [appellant's] role [in the murder] was major. This constituted non-statutory aggravation." *Id.* Appellant then speculates the jury simply "ranked" appellant and codefendant rather than making individualized determinations as to penalty. *Id.* at 71. Appellant claims trial counsel was ineffective for failing to develop this line of argument and to seek severance of the penalty proceedings; he then states appellate counsel likewise should have developed the theory and alleged trial counsel was ineffective on this ground.

The Commonwealth responds the layered claim does not warrant PCRA relief because appellant did not develop legal argument to support the claim; did not proffer evidence to overcome the presumption of reasonable performance; the joinder of

---

[18] Codefendant presented evidence of the following statutory mitigating circumstances under Section 9711: (e)(1) (no significant history of prior criminal convictions); (e)(4) (age at the time of the crime); (e)(7) (participation in homicidal act was relatively minor); and (e)(8) (catch-all).

proceedings was statutorily required and constitutionally permissible; and appellant was not prejudiced by the joint hearing. The PCRA court noted "Pennsylvania's death penalty statute requires that the same jury which rendered the verdict as to guilt is to determine the penalty." PCRA Court Op. at 32, *citing* 42 Pa.C.S. §9711(a)(1). The court further noted this Court has held a defendant's constitutional right to individualized sentencing does not require separate penalty hearings. *Id.*, *citing Commonwealth v. Bond*, 985 A.2d 810, 824 (Pa. 2009). The court consequently determined the layered ineffectiveness claim lacked arguable merit.

Again we discern no reversible error. First, the statutory provision cited by the trial court provides, "After a verdict of murder of the first degree is recorded and **before the jury is discharged**, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment." 42 Pa.C.S. §9711(a)(1) (emphasis added). Neither appellant nor codefendant sought severance as to the guilt phase portion of the trial, and the jury convicted them both of first-degree murder. Thus, before the jury was discharged, it was obligated under the statute to determine the penalty for both defendants. The same jury would necessarily be required to hear the mitigating evidence for both, regardless of whether the penalty proceedings were conducted separately or as one.

Of course, counsel could have sought severance of the entire trial, posing the current argument in support. But there are recognized countervailing reasons why related cases, and related defendants, are tried together. Such decisions on severance are generally within the discretion of the trial court. *See Commonwealth v. Travers*, 768 A.2d 845, 846 (Pa. 2001); *Commonwealth v. Lopez*, 739 A.2d 485, 501 (Pa. 1999). Notably, appellant does not account for these cases. Given this reality, it is difficult to fault trial counsel for not formulating the argument present counsel has now mustered.

Moreover, this Court has recently reiterated there is no constitutional right to a separate sentencing hearing, so long as each defendant receives an individualized sentence and the jury is free to consider the mitigation evidence. *Daniels*, 104 A.3d at 317.[19] Additionally, in holding there is no constitutional right to individualized sentencing proceedings, this Court has rejected virtually the same claims forwarded here. *See Commonwealth v. Simpson,* 66 A.3d 253, 275 n.27 (Pa. 2013) (rejecting claim of prejudice in joint penalty proceeding where evidence allegedly cast codefendant in more sympathetic light given codefendant's pursuit of greater number of mitigating circumstances). Here, despite appellant's assertions and speculations to the contrary, the jury was free to consider the relevant mitigating evidence for each defendant and to make individualized penalty determinations for both based on the merits. Moreover, juries are presumed to follow a court's instructions. *Commonwealth v. Poplawski*, 130 A.3d 697, 717 (Pa. 2015). In relevant part, the trial court instructed this jury as follows:

> I need not tell you again that although these defendants are being tried at the same time, they are here on the penalty phase the same as they were in the guilt or innocence phase, and that is separately. You are to consider the evidence against each one separately and apply the law to each one separately.

N.T. 3/11/94 at 88. Accordingly, the PCRA court did not err in dismissing this layered claim of counsel's ineffectiveness.

## X. *Simmons* claim

---

[19] Appellant does not suggest the United States Supreme Court has ever recognized a due process right to separate sentencing proceedings for capital codefendants. It would be unusual to devise such a new constitutional rule through the guise of finding counsel ineffective.

During the penalty phase, defense counsel argued to the jury "life imprisonment is [an] onerous punishment in and of itself," N.T. 3/13/94 at 77, but counsel did not ask the court to instruct the jury that life imprisonment in Pennsylvania means a life term without possibility of parole. Appellant claims trial counsel was ineffective for failing to seek such an instruction, and appellate counsel was ineffective for failing to raise a claim of trial counsel's ineffectiveness, because the prosecutor, during closing argument, put appellant's future dangerousness at issue.

The Commonwealth and the PCRA court respond the seminal case in this domain, *Simmons v. South Carolina*, 512 U.S. 154, 161-62 (1994) (plurality), which held defendants are entitled, in appropriate circumstances, to an instruction explaining life imprisonment means life without parole, was not decided until after appellant's trial. Moreover, under Pennsylvania law at the time of appellant's trial, a jury was expressly prohibited from being informed that life meant life without parole. *See Commonwealth v. Travaglia*, 792 A.2d 1261, 1265 (Pa. 2002) (explaining prior to United States Supreme Court's decision in *Simmons*, the law in Pennsylvania expressly prohibited juries from being informed life meant life without parole), *citing Commonwealth v. Thompson,* 739 A.2d 1023, 1032 (Pa. 1999).

Nevertheless, appellant argues *Simmons* had been argued before the High Court by the time of his trial, a decision was pending in the case, and he claims "reasonably competent counsel should have requested the instruction, in an abundance of caution, to protect his client's interests[.]" Appellant's Brief at 75. We disagree that counsel can be so faulted. Indeed, this Court has repeatedly held trial counsel cannot be deemed ineffective for failing to anticipate *Simmons* would change the law in this Commonwealth. *Thompson*, 739 A.2d at 1032 (collecting cases) (rejecting argument counsel should have anticipated *Simmons* decision based on High Court's grant of

*certiorari* in that case prior to start of Thompson's trial).  Accordingly, the PCRA court did not err in denying relief on this layered ineffectiveness claim.

## XI. Vienna Convention

Appellant is a citizen of Trinidad and Tobago, and argues pursuant to Article 36 of the Vienna Convention on Consular Relations (Vienna Convention),[20] the United States and the Commonwealth of Pennsylvania were required to inform him he had an absolute right to contact the Trinidadian embassy regarding his arrest, detention, conviction and condemnation.  Appellant's Brief at 75-76.  He claims, had he been properly informed, "the consulate could have provided substantial assistance" to "ensur[e] that he received a fair trial and avoided the death penalty."  *Id.* at 76.  He speculates "consular officials would have provided [him] with legal and financial assistance for investigation and mitigation development and presentation of relevant mitigating evidence about his background in Trinidad."  *Id.* at 76-77.  Appellant then claims prior counsel were ineffective for failing to raise this claim.  He makes no developed presentation as to why his layered ineffectiveness claim has arguable merit, but asserts counsel could have had no reasonable basis for failing to assert his rights under the Vienna Convention and he maintains he was prejudiced.

The Commonwealth responds the underlying claim lacks merit because the Vienna Convention, and federal case law interpreting it, does not confer individually enforceable rights or provide a judicial remedy for its violation.  *See* Vienna Convention

---

[20] The Vienna Convention, Apr. 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No 6820, was ratified by the United States upon the advice and consent of the Senate in 1969.  *See Medellin v. Texas*, 552 U.S. 491, 499 (2008).

(Preamble) (purpose of Vienna Convention "is not to benefit individuals" but "to contribute to the development of friendly relations among nations"); *Cardenas v. Dretke*, 405 F.3d 244, 253 (5th Cir. 2005) ("Vienna Convention does not confer individually enforceable rights"); *United States v. Ademaj*, 170 F.3d 58, 67 (1st Cir. 1999) (Vienna Convention itself prescribes no judicial remedy or other recourse for its violation). *Cf. Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337 (2006) (High Court declined to decide whether Vienna Convention grants enforceable rights to individuals).

The PCRA court determined because appellant could have raised the underlying claim at trial or on direct appeal, but did not, it is waived, as is his claim of trial counsel's ineffectiveness. The court concluded the claim of appellate counsel's ineffectiveness was not properly layered, and is meritless in any event.

In *Sanchez-Llamas*, the United States Supreme Court consolidated and decided two cases concerning the availability of judicial relief for violations of the Vienna Convention. Both defendants were foreign nationals who were arrested for serious crimes, but were not informed they could request the consulates of their home countries be notified of their detentions. The High Court began by noting Article 36 of the Vienna Convention "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." *Id.* While declining to decide whether Article 36 conferred enforceable individual rights, the High Court stated "Article 36 does not guarantee defendants **any** assistance at all. The provision secures only a right of foreign nationals to have their consulate **informed** of their arrest or detention — not to have their consulate intervene[.]" *Id.* at 349 (emphasis in original).

In the first *Sanchez-Llamas* case, among other things, the High Court determined Act 36 did not require suppression of evidence because the defendant had not been informed of the right to notify his consulate. *Id.* at 350. In the second case, a state

court had dismissed the defendant's Article 36 claim because he failed to raise the claim at trial or on direct appeal and thus he was barred, pursuant to state procedural rules, from raising it on collateral review. *Id.* The High Court held claims under Article 36 can be subject to state procedural default rules. *Id.* at 358-60.

In *Commonwealth v. Padilla*, 80 A.3d 1238 (Pa. 2013), this Court applied the holdings of *Llamas-Sanchez* in a direct capital appeal. We declined the appellant's invitation there to "fashion an appropriate remedy" for alleged violations of Act 36, determined there was no support for his expansive interpretation of the Vienna Convention, and dismissed his claims of trial court error, in part because "his view is supported neither by the text of the treaty nor the United States Supreme Court." *Padilla,* 80 A.3d at 1262, *citing Llamas-Sanchez*, 548 U.S. at 349.

In light of the actual terms of the Convention, and this case law, counsel can hardly be faulted in the early 1990s for failing to forward the claim appellant has devised here. There remains no factual or legal support for this layered claim of counsel's ineffectiveness.


## XII. Overarching Ineffective Assistance

In his amended PCRA petition, appellant included the following claim for relief:

> To the extent that trial/appellate counsel failed to raise and reasonably litigate the issues described throughout this Petition, counsel was ineffective in violation of the Sixth and Fourteenth Amendments, and the corresponding provisions of the Pennsylvania Constitution. Petitioner has layered each of his ineffectiveness claims, where appropriate, to include both trial and appellate counsel. Petitioner requests a hearing with respect to each claim and asserts that he can prove each issue has arguable merit, that counsel had no reasonable basis for his actions or inactions and that Petitioner was prejudiced by counsel's deficient performance.

Appellant's Amended PCRA Petition at 56.

The PCRA court denied this claim (and all others except the claim regarding mental health mitigating evidence) without a hearing. In appellant's Rule 1925(b) statement of matters complained of on appeal, he set forth the following claim of error: "[t]rial and appellate counsel were ineffective for failing to raise the issues presented in the PCRA petition at trial, and in post-trial motions and for failing to litigate these issues on direct appeal to the Pennsylvania Supreme Court." Concise Statement of Matters Complained of on Appeal at 3. In its responsive Rule 1925(a) opinion, the court noted appellant "fails to specify the claims to which he is referring and whether they are in any manner different from the other claims asserted in his Statement of Errors." PCRA Court Op. at 33. The court concluded the claim was too vague to permit a response and deemed it waived. *Id.*

Appellant now argues he "was not obliged to describe in detail his claims of ineffectiveness in a 1925(b) statement[,]" citing the Rule itself for the proposition the statement must be concise. Appellant's Brief at 78. Aside from alleging the concise nature of his statement "cannot be held against [him]" appellant again provides no clarification regarding the substance of his claim, and significantly, he does not identify or articulate any focused claim of error or ineffectiveness apart from the "concise" claims already raised. Accordingly, to the extent appellant's claim fails to contain developed argument or citation to supporting authorities and the record, it is waived. *See Commonwealth v. Perez,* 93 A.3d 829, 838 (Pa. 2014). In any event, the **specific** claims of error and ineffectiveness raised in appellant's appeal have been addressed above and rejected.

### XIII. Cumulative Prejudice

Finally, appellant contends, even if this Court finds he is not entitled to relief on any particular claim, he is nevertheless entitled to relief because the cumulative effect of

those errors denied him a fair trial, fair sentencing proceeding, and the heightened procedural safeguards in capital cases. He notes the PCRA court rejected one of his guilt phase claims and one of his penalty phase claims on the ground he failed to show resulting prejudice.

While this Court has emphasized that "no number of failed claims may collectively warrant relief i[f] they fail to do so individually," *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1150 (Pa. 2012), *quoting Commonwealth v. Rainey,* 928 A.2d 215, 245 (Pa. 2007), we have also recognized that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Sepulveda*, 55 A.3d at 1150, *quoting Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009). To the extent we have adverted to prejudice principles in disposing of appellant's cognizable claims of trial or appellate counsel's ineffectiveness, we are satisfied that, even if cumulated, appellant is entitled to no relief.

## Conclusion

For the foregoing reasons, we hold the PCRA court properly dismissed appellant's petition for PCRA relief following a hearing limited to one issue. Accordingly, we affirm the order denying relief.

Justices Baer and Mundy join the opinion in full. Justices Todd and Wecht join the opinion, except with respect to the reasoning contained in Part VI.

Justice Todd files a concurring opinion in which Justice Wecht joins.

Chief Justice Saylor files a dissenting opinion in which Justice Donohue joins.