J-S04026-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| KAHHIM ODOM | |
| Appellee | No. 3348 EDA 2018 |

Appeal from the PCRA Order Entered November 9, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0002652-2012

BEFORE: BENDER, P.J.E., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:                    **FILED MAY 11, 2020**

The Commonwealth appeals from an order granting a new trial to Appellee, Kahhim Odom, under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. Odom is presently serving a life sentence for first-degree murder and other offenses. The PCRA court held that defense counsel provided ineffective assistance by opening the door for the Commonwealth to cross-examine a key defense witness, Dominique Evans, about his prior juvenile adjudication that did not involve crimes of dishonesty. The Commonwealth argues that evidence of Evans' adjudication did not prejudice Appellee, because other evidence undermined Evans' credibility and there was ample evidence of Appellee's guilt. We vacate the order awarding Appellee a new trial and reinstate his judgment of sentence.

Appellee and co-defendant Benderick Sterns were charged with murdering Rymeek Horton on November 27, 2011 on the corner of Malcolm

and Frazier Streets in Southwest Philadelphia. The following evidence is available for review.[1] The murder stemmed from a fight between Appellee and Horton one week earlier in which Appellee dislocated Horton's shoulder. N.T. 4/9/13, at 151-53; 4/12/13, at 82-83, 116-17. On the night of the murder, Horton smoked marijuana with Ramil Andrews and two brothers, Omar and Amir Jones, in front of Omar and Amir's grandmother's house on the corner of Malcolm and Frazier Street. Vance Bradley, another friend from the neighborhood, also smoked with the group that evening. All of Horton's companions became witnesses to his death. N.T. 4/9/13, at 154-56; 4/12/13, at 83-88.

When the group ran out of marijuana, Horton and Omar decided to walk down Frazier Street in the direction away from Whitby Avenue to get more.

_____

[1] We refrain from including certain evidence in our review in light of information provided by the Commonwealth in its appellate brief.

Specifically, prior to trial, the police obtained signed statements from several persons—Amir Jones, Omar Jones, Stephon Brandon, and Paula Sharp—implicating Appellee in the murder. During trial, these witnesses testified inconsistently with their pretrial statements, so the Commonwealth introduced their statements as substantive evidence under Pa.R.E. 803.1.

In the present appeal, the Commonwealth has informed us that several police detectives and officers involved in the murder investigation are now under investigation by the Philadelphia District Attorney's Office's Conviction Integrity Unit. Commonwealth's Brief at 18 n.5. Therefore, in its brief, the Commonwealth "abstained from relying on any statements made to detectives by witnesses who provided testimony at trial that was inconsistent with their prior statements. This includes portions of Omar Jones, Amir Jones, Paula Sharp, and Stephon Brandon's statements." *Id.* We commend the Commonwealth for taking this step, and we too, will exclude these pretrial statements from our review.

As they walked, Horton turned around and headed back toward Malcolm Street. Earlier that evening, Horton had asked his uncle to keep the door unlocked, and he wanted to make sure it was, in fact, unlocked. N.T. 4/9/13, at 154-56; 4/15/13, at 77-80. Suddenly, two hooded men coming from Whitby Avenue ran toward Horton and shot him. The first shooter, wearing a dark hoodie, fired from the pavement. The other shooter wore a grey hoodie and ran into the middle of the street to shoot. At first, the second shooter's gun jammed, and Omar heard it clicking. The shooter "racked" the gun and shot Horton in the back, and Horton fell to the ground. Omar took off running down Malcolm Street toward 57th Street. N.T. 4/12/13, at 83-88, 98-102.

While Horton and Omar were on their way to obtain marijuana, Amir and Andrews planned to go to a Chinese store around the block. Before they left, however, Amir saw the two killers run down Frazier Street and shoot Horton. He saw a shooter in a dark hoodie on the pavement, while another shooter in a grey hoodie moved into the middle of the street. The second shooter's gun jammed, and Amir watched him clear the chamber before resuming shooting. After the initial shots, Amir ran, but as he looked back he saw the shooter in the grey hoodie stand over Horton and shoot him in the face four times, killing him. N.T. 4/10/13, at 207-19.

Bradley had gone inside his house on Frazier Street when the shooting started. Upon hearing gunshots, he dropped down and crawled to the door. Through an opening in the door, he saw Horton on the ground in the middle of the street. He observed co-defendant Sterns walk toward Horton, lean

over, and fire four shots into his head, which caused it to jerk each time. Appellee Odom stood a few feet behind Sterns. Bradley saw Stems' face through his hoodie, and saw Appellee's face when his hood came down as he ran away. N.T. 4/9/13, at 141-44, 154-72.

Jeffrey Taylor, who lived on the 5600 block of Whitby Avenue, arrived at home and parked his car between Malcolm Street and Whitby Avenue on Frazier Street. N.T. 4/10/13 at 62, 64. As he walked down Frazier Street and then down Whitby Avenue, he saw two men get out of a white Chevrolet Impala parked on Whitby Avenue near Frazier Street. *Id.* at 65-66. One wore a gray hoodie, the other a dark hoodie. *Id.* at 68. The two men walked toward the intersection of Malcolm and Frazier Streets. *Id.* at 66. Taylor continued walking home but then heard gunshots from the direction of that intersection. *Id.* at 69. He looked back toward the sound of the gunshots and saw the same two men run back with guns in hand, get in the car, and drive off. *Id.* at 70. Taylor got into his car and parked it in the middle of the street near Whitby and Frazier to preserve the scene and block traffic.

The police found fired cartridge casings and an unfired cartridge near Horton's body in the middle of the street, where Omar and Amir Jones had seen Stern rack his gun. Ballistic evidence demonstrated that at least two guns were used in the murder. N.T. 4/9/13, at 76; 4/10/13, at 62-72; 4/12/13, at 153-56, 209-15.

Police obtained arrest warrants for Appellee and Sterns. When initial attempts to arrest them proved unsuccessful, the detective assigned to the

case turned the warrants over to the fugitive squad, which found Appellee a month later at his grandmother's house in a different section of Philadelphia. N.T. 4/15/13, at 54-59. Sterns was arrested at his girlfriend's residence. *Id.*

As trial neared, multiple prosecution witnesses, including Bradley and Omar Jones, faced intimidation. Bradley was arrested on unrelated charges in September of 2012 and spent time at Curran-Fromhold Correctional Facility while he awaited trial. Some of the inmates discovered that he had given a statement in this case and tried to attack him, necessitating his transfer to another county prison. N.T. 4/9/13, at 245-46; 4/10/13, at 45. When Omar was subpoenaed, he told detectives that he was worried he was going to be killed for testifying. While he waited to testify on the day of Appellee's preliminary hearing, three of Appellee's friends, including Appellee's future alibi witness Dominique Evans, surrounded Omar in the courtroom. Police took the three outside, but they again surrounded Omar when he walked into the hallway. A few months after Omar's testimony, his family was celebrating Mother's Day at his grandmother's house. Someone opened fire on the house, striking his grandfather once and another family member five times. N.T. 4/12/13, at 123-27, 135-37; 4/15/13, at 17-31; 4/16/13, at 33-36, 61-64.

During trial, Bradley testified that Appellee was one of the shooters, testimony that was consistent with his pretrial statement to the police. N.T. 4/9/13, at 156-72, 185-92; 4/10/13, at 25-42, 45.

Evans testified for Appellee as an alibi witness and claimed that Appellee was with him the night of the murder, two blocks away from where Horton

was shot. Evans stated that he walked with Appellee to Malcolm and Frazier Streets after hearing the shots. N.T. 4/16/13, at 19-23. However, Officer Torin Saunders, who responded to the shooting, testified that Evans walked by the crime scene alone three times while talking on a cell phone. *Id.* at 210-11.

When the prosecutor asked why he did not promptly tell police that Appellee could not have been involved in the murder, Evans claimed that he did not know he could walk into a police station and provide information that way, and that he had never been in a detective's office before. When probed further, Evans admitted that this was a lie. Months earlier, Evans had walked unprompted into Detective Richard Antonini's office to provide an alibi for another friend, Rashan Gaffney, in a different shooting. *Id.* at 42-56.

The prosecutor asked Evans about his interactions with Omar Jones at the preliminary hearing. Evans denied being near Omar that day, testimony that conflicted with the accounts of events provided by Omar and Officer Saunders. N.T. 4/12/13, at 121-32; 4/15/13, at 17-32; 4/16/13, at 33-36, 61-64. In addition, Evans admitted that he composed rap lyrics characterizing himself as willing to kill people who crossed him, especially people who talked to police. The lyrics stated (1) "they niggas snitchin'. Niggas acting like bitches, these bitches acting like niggas till their family is missing;" (2) he would "call a pistol" on the snitches, and then "slide through with the pistol[,]" make sure "no bullets miss[ed them]. Make [their] homies forget [them].

[With their] DNA on the tissue;" and (3) "probation had [him] bitchin', [in a] room full of bitches[.]" N.T. 4/16/13, at 77-80, 93-97.

On redirect, Appellee's attorney tried to rehabilitate Evans by asking him whether he had any gun or robbery convictions. Evans claimed that he did not. On recross, the prosecutor introduced evidence that Evans had been adjudicated delinquent for carrying a gun without a license and possessing a controlled substance with the intent to deliver it. Evans explained that he thought those adjudications had been expunged, and therefore no longer counted. *Id.* at 103-08.

During closing argument, defense counsel argued that Evans testified that he had no convictions because his adjudication had been expunged, and "in his mind," expungement meant that the adjudication never happened. N.T. 4/16/13, at 261. The Commonwealth did not mention Evans' adjudication during its own closing. *Id.* at 297-350.

At the conclusion of an eight-day trial, the jury found Appellee guilty of first-degree murder, conspiracy to commit murder, carrying a gun without a license, carrying a gun on the streets of Philadelphia, and possessing an instrument of crime.[2] The court sentenced Appellee to life in prison. Appellee appealed and objected, *inter alia*, to the prosecutor's failure to turn over notes of a police detective's interview with Appellee's alibi witness, Evans. The trial

---

[2] 18 Pa.C.S.A. §§ 2502, 903, 6106, 6108, and 907, respectively.

court issued a Pa.R.A.P. 1925 opinion stating, "When compared to the overwhelming evidence presented by the prosecutor, the notes were not material." Trial Court Opinion, 12/6/13, at 14. This Court affirmed on direct appeal, and our Supreme Court denied Appellee's petition for allowance of appeal.

Appellee filed a timely PCRA petition raising an evidentiary claim and various claims of ineffective assistance of counsel. The PCRA court (the same judge who presided over trial) appointed PCRA counsel, who filed a no-merit letter and moved to withdraw. Appellee responded with new claims of ineffective assistance of counsel, including an allegation that defense counsel provided ineffective assistance at trial by opening the door to evidence of Evans's prior adjudications. PCRA counsel filed a revised no-merit letter. The PCRA court ordered an evidentiary hearing relating to the admission of Evans' prior adjudications and denied all other claims.

At the evidentiary hearing, defense counsel testified that she discussed Appellee's alibi defense with Evans before trial, and he assured her that his only issues involved a dependency matter for skipping school as a juvenile. She admitted, however, that she did not have a copy of Evans' criminal extract and failed to ask the prosecutor for one. She was surprised when Evans' prior adjudications came to light at trial. N.T. 9/20/18, at 7-8, 13-16.

The PCRA court granted Appellee's petition and ordered a new trial. The Commonwealth timely appealed. The PCRA court issued a Pa.R.A.P. 1925

opinion reasoning that Appellee's claim of ineffective assistance had merit, and that defense counsel acted unreasonably.

> [Appellee's] alibi defense theory lived or died on the testimony, and credibility, of Evans. A reasonable jury may have concluded that the Commonwealth's attack on Evans' rap lyrics and skills did not translate to his actual conduct in life; music is expression, not a statement of fact, and Evans explained that to the prosecutor. N.T. 4/16/13 at 93-97. However, when [defense counsel] attempted to bolster Evans' credibility by mistakenly seeking to elicit testimony as to his never having been arrested, she opened the door to testimony pertaining to juvenile adjudications that the Commonwealth had not attempted to pursue because they were not *crimen falsi* and would have been inadmissible. She further complicated things by asking him directly if he had any charges for firearms.
>
> [When defense counsel] heard the prosecutor question Evans about the lyrics in his rap, no reasonable attorney would have continued with asking the witness if he had ever been arrested unless she knew this to be an unimpeachable fact. Instead, counsel should have asked to see the Court at sidebar and should have asked the Court what evidence the prosecutor had regarding convictions for her witness. This would have prevented her from broadening the extent of his impeachment.

PCRA Court Opinion, 3/13/19, at 8. In contrast to her prior conclusion that the Commonwealth's evidence was "overwhelming," Trial Court Opinion, 12/6/13, at 14, the PCRA court stated that "[t]he Commonwealth's case was not strong," PCRA Court Opinion, at 8, so the evidence of Evans' prior adjudications prejudiced Appellee.

> Identifications of [Appellee] as one of the men who shot decedent had been made by two witnesses who had been smoking marijuana at the time, both of whom claimed he was coerced by the police, and both of whom had a long-term, personal relationship with decedent. Weighed against this evidence, [Appellee's] alibi defense would more likely have been successful. However, when trial counsel for [Appellee] opened the door to

- 9 -

Evans' impeachment, her ineffectiveness undercut that defense and prejudiced him.

*Id.*

The Commonwealth raises a single issue in this appeal: "Did the PCRA court erroneously conclude that trial counsel prejudiced [Appellee's] trial by opening the door to evidence of his alibi witness's prior juvenile adjudication when that witness had already been exposed as a liar and a manipulator?" Commonwealth's Brief at 4.

When reviewing a PCRA order, we examine whether the record supports the PCRA court's factual findings and whether its legal conclusions are free from error. *Commonwealth v. Hannibal*, 156 A.3d 197, 206 (Pa. 2016). We view the PCRA court's findings and evidence of record in the light most favorable to the prevailing party. *Commonwealth v. Koehler*, 36 A.3d 121, 131 (Pa. 2012). The PCRA court's credibility determinations, when supported by the record, are binding, but we review the PCRA court's legal conclusions de novo. *Commonwealth v. Roney*, 79 A.3d 595, 603 (Pa. 2013). The petitioner has the burden of persuading us that the PCRA court erred and that such error requires relief. *Commonwealth v. Wholaver*, 177 A.3d 136, 144-45 (Pa. 2018).

A petitioner may obtain relief under the PCRA by pleading and proving "ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A.

§ 9543(a)(2)(ii). Counsel's effectiveness is presumed, and the petitioner bears the burden of proving otherwise. *Commonwealth v. Urwin*, 219 A.3d 167, 172 (Pa. Super. 2019). To establish ineffectiveness of counsel, the petitioner must plead and prove: (1) his underlying legal claim has arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) counsel's actions prejudiced him. *Id.* Failure to satisfy any of these three prongs requires dismissal of the claim. *Id.*

We limit our analysis to examining only the issue of prejudice, as the Commonwealth does not contend in its appellate brief that Appellee's argument lacks merit or that defense counsel's actions were reasonable.

The Commonwealth argues that Appellee cannot demonstrate prejudice from the admission of evidence of Evans' adjudication. To establish prejudice, a PCRA petitioner must demonstrate that "counsel's chosen course of action had an adverse effect on the outcome of the proceedings." *Commonwealth v. Chambers*, 807 A.2d 872, 883 (Pa. 2002). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[A] speculative or attenuated possibility of a different outcome," however, "is insufficient to undermine confidence in the outcome." *Commonwealth v. Jones*, 210 A.3d 1014, 1019 (Pa. 2019) (citing

- 11 -

*Harrington v. Richter*, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable")).

We review the PCRA court's determination of prejudice *de novo*, because it concerns a question of law—whether the evidence satisfies the legal standard of prejudice—instead of a question of fact. *Hannibal*, 156 A.3d at 206. In our estimation, the admission of Evans' juvenile adjudication for carrying a weapon and possession with intent to deliver a controlled substance was not so serious an error as to deprive Appellee of a fair trial or undermine confidence in the outcome.

In a dramatic departure from her position on direct appeal that the evidence was "overwhelming," the PCRA court declared that the Commonwealth's evidence was "not strong," because two eyewitnesses, Omar and Amir Jones, had been smoking marijuana at the time of the murder and claimed that police coerced their pretrial statements accusing Appellee of the murder. PCRA Ct. Op. at 8. As a result, the PCRA court ruled, Evans' alibi testimony would likely have been successful had defense counsel not opened the door for Evans' prior adjudication. *Id.* We disagree for several reasons.

First, the Commonwealth presented substantial evidence of Appellee's guilt that the PCRA court overlooked. Appellee had a motive to kill Horton because the two were on bad terms. They had a fight one week before the shooting in which Appellee dislocated Horton's shoulder. Vance Bradley gave damning testimony that he observed Appellee and Sterns, both in hoodies,

approach Horton and murder him in cold blood. Bradley never wavered from this testimony even though inmates at his correctional facility, where he was incarcerated on unrelated charges, attempted to attack him after discovering that he had given a statement in this case. Other facts corroborated Bradley's testimony. Ballistics evidence demonstrated that two guns were used in the murder. While we do not consider the pretrial statements of Omar and Amir Jones[3], we do take into account their trial testimony, in which they both said that two men wearing hoodies shot Horton. Furthermore, Jeffrey Taylor, who lived near the scene of the crime, testified that he saw two men wearing hoodies exit a car and walk toward Malcolm and Frazier Streets. He heard shots from the direction of that intersection and then saw the same two men run back, guns in hand, enter the car and drive away.

Not only did the Commonwealth furnish considerable evidence of guilt, but it also rebutted Evans' alibi testimony with the factual testimony of Officer Saunders and other evidence that damaged Evans' credibility. Evans stated that at the time of the shooting, he was with Appellee two blocks away, and he walked with Appellee to the scene of the shooting after hearing the shots. Officer Saunders testified, however, that Evans was talking on a cell phone that night and walking alone. Moreover, the Commonwealth brought out credibility problems with Evans' testimony that were unrelated to his

---

[3] **See** n. 1, **supra**.

adjudication. Evans testified that he delayed in reporting his alibi for Appellee because he had never been in a detective's office before and did not realize he could enter a police station and provide alibis for defendants. The Commonwealth showed that this was a lie by forcing Evans to admit on cross-examination that he once walked into a detective's office to provide an alibi for another person in a different shooting. The Commonwealth also demonstrated that (1) Evans and others surrounded Omar Jones when Jones came to court to testify against Appellee, and (2) Evans glorified violence against Commonwealth witnesses by composing rap lyrics in which he portrayed himself as willing to kill people who talked to police. Evans' lie about his delay in reporting the alibi, his conduct toward Omar, and his rap lyrics extolling violence against snitches were at least as damaging to his credibility as his juvenile adjudication, if not more so, yet the PCRA court failed to take these facts into account. Finally, and notably, the Commonwealth did not mention Evans' adjudication once during its closing argument.

Based on the substantial evidence of Appellee's guilt, Evans' lack of credibility, and the lack of importance of Evans' juvenile adjudication in the overall context of Appellee's lengthy trial, we hold that the admission of Evans' adjudication does not undermine our confidence in the outcome of Appellee's trial. There is no reasonable probability that, absent counsel's misstep, the result of the proceeding would have been different. We hold that the PCRA court erred by determining that the introduction of this adjudication prejudiced

Appellee. *See Commonwealth v. Bishop*, 936 A.2d 1136, 1141 (Pa. Super. 2007) (defense counsel did not provide ineffective assistance in rape case despite initiating questions concerning FBI investigation as to whether appellant was serial rapist and murderer; there was "no reasonable probability that the outcome of the trial would have been different" due to other compelling evidence against appellant). We vacate the order granting Appellee a new trial and remand for reinstatement of his judgment of sentence.

Order vacated. Case remanded for reinstatement of judgment of sentence. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/20