J-S20022-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LAUREN PATRICIA DALY | |
| Appellant | No. 1510 EDA 2019 |

Appeal from the PCRA Order Entered April 17, 2019
In the Court of Common Pleas of Delaware County
Criminal Division at No: CP-23-CR-0003801-2013

BEFORE:  SHOGAN, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY STABILE, J.:                              **FILED JULY 29, 2020**

Appellant, Lauren Patricia Daly, appeals from an order denying her petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  Upon review, we affirm.

The following evidence was adduced during trial:

> Prior to her arrest, [Appellant] was a pediatrician who worked for the A.I. DuPont Hospital for Children in Wilmington, Delaware.  In 1999, she met and became romantically involved with Margaret Grover, a nurse.  They moved in together and decided to raise a family.  [Grover] became pregnant by artificial insemination and gave birth to [E.D.]  [Appellant] then adopted [E.D.]  [Appellant] became pregnant by artificial insemination and gave birth to [M.D.]  Grover then adopted [M.D.]
>
> The relationship between [Appellant] and Grover was marred by violence.  Each accused the other of physical assaults.  After an incident in April 2011, they separated, and each child departed with his /her respective natural mother.
>
> Each parent sought and was granted custodial time with the other's natural child, and the arrangement was embodied in an

order of the Court dated May 27, 2013. [Appellant] was also ordered to pay child support for [E.D.], who, in 2013, attended the Haverford School.

Despite the presence of an order, disputes nevertheless materialized, animosities flared and confrontations—verbal and physical—came to pass. Each introduced evidence of the other's violent acts. Of note is Grover's allegation that during a drop-off of [M.D.] on the evening of Mother's Day, 2013, [Appellant] first stood in front of Grover's car in a menacing posture and refused to move. [Appellant] then walked toward Grover and attempted to open the car door. Sensing danger, Grover drove away and, the next day, contacted her attorney. [Appellant], on the other hand, asserted that she was the victim and that Grover attempted to use the car as a lethal weapon.

The parties and their lawyers hammered out an agreement that was memorialized in a series of letters. The substance of that agreement was that all drop-offs and pickups of either child would be "curbside." During any exchange, [Appellant], Grover and the "significant other" of each would have no contact and would remain at least 100 feet away from each other.

At trial, Grover testified that on May 27, 2013, at the end of Memorial Day weekend, she transported [M.D.] to [Appellant]'s house. As she approached, she spotted Donna Helgenberg, [Appellant]'s then current "significant other," outside in the garden. Sensing trouble, Grover drove away, removed a phone and a can of mace from the back of the car, and drove to the front of [Appellant]'s house with [E.D.] in the front passenger's seat and [M.D.] in the back seat. While exiting the car, [M.D.] dropped her backpack and swim suit onto the ground. Grover turned around and looked to the rear to assess the situation, but when she turned forward, she saw that [Appellant] had suddenly emerged and was standing at the front of her car. [Appellant] struck the grill of Grover's car. She then pulled out a gun, pointed it at the windshield and shot three bullets, which struck Grover's face, chest and abdomen. After firing the third bullet from the 9 mm automatic, the gun jammed and could fire no more without clearing the jammed bullet casing. Grover telephoned 911, reported the incident and then drove to Riddle Hospital.

The State Police responded to the scene and spoke with Donna Helgenberg. Trooper Wiley transported Donna Helgenberg and

[M.D.] to the barracks and attempted to interview both. At the scene, other troopers spoke with [Appellant], who advised them of the location of the gun. While attempting to secure it, one Trooper noted that it was jammed, or "stove-piped," as a ballistics expert later explained.

Troopers Kirby and O'Donnell took [Appellant] to the barracks. After being advised of her rights, [Appellant] gave a recorded statement in which she asserted that she purchased a gun to protect herself from Grover's repeated attempts at her life. She admitted that she shot three bullets at Grover's car, but she asserted that she did so because she was afraid that Grover was "going to try to run [her] over" and to "try to kill [her] again." [Appellant] predicted that Grover would announce that she "won the lottery" and would look "like a victim." [Appellant] will go to jail, and Grover will get the kids.

The State Police transported Grover's car, a 2011 Volvo, to the barracks, where Corporal Elias and others conducted a bullet trajectory analysis. They found three bullet holes and impact sites in the car. They set up trajectory rods showing the paths of the bullets from the outside to the inside of the car. Elias then went to the scene of the incident and, after further inspection, concluded that the evidence was consistent with a five foot three inch shooter standing directly in front of the car and firing the first shot and with the same person placing her arms on the hood, leaning forward, extending her arms, and firing the next two shots. The evidence was more consistent with a static car and shooter rather than a scenario involving a moving car and/or shooter.

The police then obtained search warrants, first of [Appellant]'s person and then of her house. A strip search revealed no injuries on her person. While searching her house, they found in her belongings a document entitled "Here's the Plan" dated March 7, 2013 that set forth an elaborate plot to alter the custody arrangements of the children.

The author, presumably [Appellant], sought to have Peg Grover "lose[] her mind" by proposing that each vacate her respective parental rights over the natural child of the other. If Grover were to refuse, then [Appellant] would commence a custody battle punctuated by "fucking" with [E.D.], encouraging that he be expelled from the Haverford School, proving that he was

dangerous, trashing Grover's character and proving that [M.D.] did not want to spend time with Grover. The plan contemplated a scorched earth policy in which she would hit a "mouse with [a] sledgehammer!"

. . .

The case proceeded to trial, during which the prosecution argued that [Appellant] intended to kill both Grover and [E.D.] In support of that, the ADA presented evidence showing that [Appellant] advised many, including school staff, that he was the "next Jeffrey Dahmer" and a future serial killer. [Appellant] rarely saw or even contacted him. [Appellant] referred to him as "Satan's spawn" and a "nasty little boy."

[Appellant] frequently proposed to Grover that they mutually vacate their parental rights. The prosecution argued that the attempted murder was a scheme designed to rid herself of the obligation of paying expensive private school tuition, child support and the like. Rather than follow through on the "plan" outlined in the March 7, 2013 memorandum—which would have necessitated paying large sums of money for lawyers, psychologists, teachers, and custody evaluators—[Appellant] decided to take matters into her own hands and kill Grover and [E.D.] Her self-defense argument would prevail, and she would be rid of the complications and expenses of shared custody of [M.D.], the surviving child.

In response to the prosecution's portrayal of her as a mean-spirited manipulative woman who had no interest in [E.D.], [Appellant]'s counsel attempted to show that she was, in fact, a caring mother who was herself the victim of Grover's efforts to distance herself from her son. Her attorney played in open court voicemail messages from [Appellant], who expressed the desire to speak with [E.D.] Grover agreed that [Appellant] had difficulties with [E.D.]'s misbehavior, including physical attacks upon his sister, [M.D.] Grover admitted that [Appellant] sought to have [E.D.] placed at the Westtown School or at the Hill School, both expensive private schools, and did not seek to be relieved of the duty of paying private school tuition. In his cross-examination of James Greytok, the Haverford middle school principal, [counsel] elicited testimony that [Appellant] expressed concern for [E.D.]'s welfare. He suggested that she did not believe that Haverford was equipped to handle [E.D.]

- 4 -

Later in the trial, the prosecution called Corporal Elias, a ballistics expert, who, as previously noted, testified that the physical evidence was more consistent with a static car and shooter rather than a scenario involving a moving car and/or shooter. The Commonwealth also called Corporal Shawn Haines, an accident reconstruction expert. He interviewed Grover and listened to [Appellant]'s recorded statement. He and several troopers returned to the incident scene and attempted to reconstruct the incident. His findings were consistent with Grover's account of the incident; the only way he could reproduce tire marks similar to those found at the scene was to accelerate and steer to the left. They were also consistent with ballistics evidence given by Trooper Elias.

The defense did not call a ballistic expert. Rather, it called Roger Rozsas, an accident reconstruction expert with no expertise in ballistics. He took measurements at the scene, watched the State Police reenactments and took exception with the findings of Corporals Haines and Elias. Although he acknowledged the physical evidence, he disputed their conclusions. The essence of his testimony was that the physical evidence was consistent with [Appellant]'s statement to the police that the vehicle was moving toward her when she fired the gun.

[Appellant] did not testify at trial. She called various character witnesses: a Detective from the Haverford Township police department, who authenticated some incident reports; a State Trooper, who also testified as to some records; and a second state Trooper, Philip Rhyn, who testified that after being taken into custody, [Appellant] insisted that she fired the gun because Grover had attempted to run her over with a car. [Appellant] also discussed various family issues with him.

Trial Court Opinion, 10/8/15, at 1-8 (internal citations omitted).

During trial, the court granted Appellant's motion for judgment of acquittal on the charge that she attempted to murder E.D. At the conclusion of the two-week trial, the jury found Appellant guilty of all charges involving Grover, including attempted murder, aggravated assault, possession of an instrument of crime, reckless endangerment and endangering the welfare of

a child.[1]  The jury found Appellant not guilty of aggravated assault against E.D.   On September 9, 2014, the trial court sentenced Appellant to an aggregate of 273—624 months' imprisonment.

Appellant filed timely post-sentence motions, which the trial court denied, and a timely notice of direct appeal.  On November 3, 2016, this Court affirmed Appellant's judgment of sentence.  Appellant filed a timely application for reargument, which this Court denied, and a timely petition for allowance of appeal in the Supreme Court.  On June 20, 2017, the Supreme Court denied the petition for allowance of appeal.  Appellant did not appeal to the United States Supreme Court, so her judgment of sentence became final for PCRA purposes on September 18, 2017.

On September 4, 2018, Appellant filed a timely PCRA petition.  On February 7, 2018, the PCRA court filed a notice of intent to dismiss Appellant's petition without a hearing.  On April 17, 2018, the PCRA court entered an order dismissing the PCRA petition.  On May 15, 2019, Appellant filed a timely appeal to this Court from the order of dismissal.  Both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal:

I. The trial court, in the jury's presence, made an important factual determination that was crucial to [Appellant]'s self-defense claim. Trial counsel objected to the ultimate determination itself rather than the judicial finding of fact during a jury trial.  Did the PCRA court err by dismissing, without a hearing, a claim that trial

---

[1] 18 Pa.C.S.A. §§ 901, 2702, 4304, 907, and 2705, respectively.

counsel was ineffective for not asserting the legally correct and meritorious objection, and for finding such a claim was previously litigated?

II. A witness testified about arguably improper actions taken by [Appellant]'s father and paramour after she was arrested. Did the PCRA court err by dismissing, without a hearing, a claim that trial counsel was ineffective for not objecting to this irrelevant and prejudicial evidence?

III. Numerous witnesses testified that [Appellant] held animosity towards her son, but the trial court granted a judgment of acquittal on a charge that she tried to kill him due to lack of intent. Did the PCRA court err by dismissing, without a hearing, [Appellant]'s claim that trial counsel was ineffective for not moving to strike the testimony concerning the animosity towards her son because it was not relevant and prejudicial?

IV. Where [Appellant] pleaded numerous claims presenting material issues of fact, did the proffered cumulative prejudice warrant an evidentiary hearing?

Appellant's Brief at 5.

In her first argument, Appellant contends that defense counsel provided ineffective assistance by failing to object to the jury instruction that she and Grover had an "agreement" concerning curb-side drop-offs of their children. Appellant argues that she had a valid self-defense argument because she was "lawfully on her property," Appellant's Brief at 18, and believed that Grover was trying to run her over with her car. *Id.* at 7, 18. The trial court negated this argument by instructing the jury that she had an agreement with Grover not to be present during custody exchanges. Appellant's Brief at 13. Defense counsel, Appellant concludes, crippled her self-defense argument by failing to

object to this instruction. No relief is due, although we deny relief for a different reason than the Commonwealth suggests.

The attorneys for Appellant and Grover exchanged three letters two weeks before the shooting, during child custody proceedings. In the first letter dated May 15, 2013, Appellant's attorney stated, "[T]here is to be no physical contact between Peg [the victim] . . . and [Appellant] . . . pick-up and drop-off is to be curbside and the noncustodial parent may attend events and activities provided she remains at least 100 feet away from the custodial parent at all times." N.T., 6/23/14, at 96-97. On May 16, 2013, Grover's attorney authored a letter stating that "[a]ny exchanges of the child not at camp or school shall be curbside with one parent and significant other remaining in the car and the other parent and significant other remaining in the house . . . [M.D.] is old enough to walk from the car to the house unassisted." *Id.* at 97. On May 17, 2013, Appellant's attorney wrote, "[Appellant] is in agreement that there be no physical contact between [Appellant] and Peg and that non-school related pick-up and drop-offs be curbside." *Id.* The trial court read these letters to the jury and instructed, "This exchange of letters signifying the agreement of the clients in my opinion is an agreement that pick-up and drop-off will be curbside with respect to the child [M.D.] and that there will be no contact between [Appellant] and [Grover] during that exchange." *Id.* Subsequently, during closing instructions, the court stated that Appellant could not claim self-defense

if . . . she knew that she could avoid the necessity of using deadly force with complete safety by complying with a demand that she abstain from any action that she had no duty to make and failing to do so. This pertains to the agreement that was reached between the parties and the lawyers that the transfer of the child, [M.D.], would take place curbside. In other words, the agreement that [Appellant] would stay inside the home . . . I'm going to read that to you again, just so there's no mistaking what the provisions are. [Appellant] knew that she could avoid the necessity of using deadly force with complete safety by complying with a demand that she abstain from any action she had no duty to make and failing to do so by coming out of the house and coming to the proximity of this automobile during the transfer of the child. If the Commonwealth proves [this] beyond a reasonable doubt, the actions of [Appellant] are not justified.

N.T., 7/7/14, at 144-45.

On direct appeal, Appellant argued that "the trial court erred in accepting the Commonwealth's argument that an exchange of letters between the respective domestic relations counsel for the appellant and her spouse constituted a Court Order, or enforceable agreement." ***Commonwealth v. Daly***, No. 2029 EDA 2015 (Pa. Super.), Appellant's Brief at 55. The court's decision to instruct the jury that Appellant and Grover entered an agreement, Appellant continues, prejudiced Appellant by "eviscerat[ing] [her] self-defense claim." ***Id.*** at 60. In its opinion on direct appeal, however, the trial court concluded that a letter by Appellant's attorney "did, in fact, memorialize an agreement by [Appellant] that she and Grover would have no contact during the non-school drop-offs and pickups, all of which were to be conducted 'curbside.'" Trial Court Opinion, 10/8/15, at 21. This Court concurred, stating, "We agree with the sound reasoning of the trial court, as set forth in its

- 9 -

Opinion, and affirm on this basis." **Daly**, 2016 WL 6519019, at \*5 (Pa. Super. 2016) (memorandum).

Appellant argues strenuously that defense counsel was ineffective for failing to object to the jury instructions that Appellant had a no-contact agreement with Grover. According to Appellant, the jury, in its role as factfinder, had sole authority to decide whether an agreement existed, but the court usurped the jury's authority by making this finding itself. Absent this improper act, Appellant claims, she "could have argued to the jury that her presence on her own property, in conjunction with her belief that she was being attacked with a deadly weapon, obviated any requirement that she retreat from the situation before taking action to protect herself." Appellant's Brief at 20. Significantly, she states no fewer than ten times that she was on her own property. **Id.** at 15-21.

To obtain relief on a claim of ineffective assistance of counsel, Appellant must prove that: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable basis for his actions or failure to act; and (3) the petitioner was prejudiced by counsel's deficient performance such that there is a reasonable probability that the result of the proceeding would have been different absent counsel's error or omission. **Commonwealth v. Pierce**, 527 A.2d 973, 975 (Pa. 1987). Counsel is presumed to have rendered effective assistance, and a PCRA petitioner asserting otherwise bears the burden of proof. **Commonwealth v. Isaac**, 205 A.3d 358, 362 (Pa. Super. 2019).

When reviewing a PCRA order, we examine whether the record supports the PCRA court's factual findings and whether its legal conclusions are free from error. *Commonwealth v. Hannibal*, 156 A.3d 197, 206 (Pa. 2016). We view the PCRA court's findings and evidence of record in the light most favorable to the prevailing party. *Commonwealth v. Koehler*, 36 A.3d 121, 131 (Pa. 2012). The petitioner has the burden of persuading us that the PCRA court erred and that such error requires relief. *Commonwealth v. Wholaver*, 177 A.3d 136, 144-45 (Pa. 2018).

The Commonwealth argues that Appellant cannot obtain relief because her objection to the jury instruction was previously litigated[2] on direct appeal and has simply been repackaged as a claim of ineffective assistance. We disagree. Our Supreme Court has stated that

> ineffectiveness claims are distinct from those claims that are raised on direct appeal. The former claims challenge the adequacy of representation rather than the conviction of the defendant. Accordingly, [] a Sixth Amendment claim of ineffectiveness raises a distinct legal ground for purposes of state PCRA review under [Section] 9544(a)(2). Ultimately, the claim may fail on the arguable merit or prejudice prong for the reasons discussed on direct appeal, but a Sixth Amendment claim raises a distinct issue for purposes of the PCRA and must be treated as such. [Accordingly, a] PCRA court should recognize ineffectiveness claims as distinct issues and review them under the three-prong ineffectiveness standard [].

---

[2] An issue has been "previously litigated" when either "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue," 42 Pa.C.S.A. § 9544(a)(2), or "it has been raised and decided in a proceeding collaterally attacking the conviction or sentence." 42 Pa.C.S.A. § 9544(a)(3).

***Commonwealth v. Collins***, 888 A.2d 564, 573 (Pa. 2005) (internal citations and quotations omitted). ***Collins*** prohibits us from holding that Appellant's argument is barred as previously litigated.

Nevertheless, Appellant's claim of ineffective assistance falls short due to lack of arguable merit. As both the trial court and this Court reasoned on direct appeal, the plain language of the letters between Appellant's counsel and Grover's counsel establishes that Appellant entered an agreement with Grover not to be present during certain pickups and drop-offs, including the incident in which Appellant shot Grover.

Even assuming that the jury should have decided whether an agreement existed instead of the trial court, Appellant's argument fails for a different reason. Appellant contends she had no duty to retreat because she was on her own property. The evidence demonstrates, however, that Appellant was on the street at the time of the shooting. Grover was in her own car parked curbside on a public street. N.T. 6/23/14, at 109, 125-26, 152, 291-93 (testimony of Grover). An eyewitness, Helgenberg, observed Appellant "standing in the middle of the street." N.T. 6/25/14, at 176. Trooper Tsung, who responded to the shooting, found shell casing in the road. N.T. 6/24/14, at 58, 61; ***see also id.*** at 121 (Trooper Rose's testimony that shell casings

were found in the street).[3]  Appellant fails to point to any evidence that the street was part of her property.  Nor does she argue that she had the right to stand her ground outside her property boundaries.  Absent evidence that she was on her own property, her self-defense argument collapses.

For these reasons, the PCRA court properly rejected this claim of ineffective assistance.

Next, Appellant argues that defense counsel was ineffective for failing to object to the testimony of child advocate Lisa Kane Brown, guardian *ad litem* for E.D. and M.D., during domestic proceedings between Appellant and Grover.  N.T., 6/30/14, at 100-23.  Brown's testimony, Appellant wrote, mostly concerned the conduct of Helgenberg and Charles Brian Daly, Appellant's father, after Appellant's arrest.  The conduct of these persons, Appellant continues, was inadmissible and prejudicial because it "had nothing to do with tending to prove [Appellant's] guilt or innocence of the charged crimes," and the Commonwealth introduced this testimony only to establish

---

[3] Appellant cites to testimony by Trooper Rose page 109 for the proposition that the shooting occurred in a "shared driveway."  Appellant's Brief at 20 (citing N.T., 6/24/14, at 109).  Trooper Rose responded to the crime scene following the 911 call; he was not a witness to this crime.  More importantly, at no point in his testimony did he claim that the shooting occurred in a shared driveway.  He uttered the words "shared driveway" to describing his position and the positioning of the other troopers when they first arrived on the scene after the shooting.  *Id.* at 107-12.  The police were in the shared driveway while they devised a plan as to how to apprehend Appellant, whom they presumed was armed.  Trooper Rose did not testify that Appellant shot Grover in the shared driveway.

that Appellant associated with unsavory individuals such as her father and Helgenberg. Appellant's Brief at 24. No relief is due.

Some of Brown's testimony concerned subjects other than Helgenberg or Appellant's father, such as Brown's role as child advocate, statements that M.D. made to her, and statements Appellant made to M.D. N.T., 6/30/14, at 100-05. Appellant does not accuse defense counsel of ineffectiveness during this portion of Brown's testimony.

The remainder of Brown's direct testimony concerns Helgenberg's and Appellant's father's conduct following Appellant's arrest. *Id.* at 105-16. Brown testified that (1) after Appellant's arrest, the court ordered her to refrain from any contact with M.D., (2) Helgenberg at first was permitted to have contact with M.D. but later was ordered to stay away from M.D., (3) Helgenberg and Appellant's father attempted to circumvent these directives by plotting to have M.D. give Appellant's father letters to give to Appellant in jail, and (4) Helgenberg also attempted to stay in touch with M.D. by becoming the coach of her softball team. *Id.* Defense counsel did not provide ineffective assistance during this testimony; to the contrary, he raised multiple hearsay and relevance objections. *Id.* at 108, 109, 111, 113, 115 (hearsay objections); 110 (relevance objection). Furthermore, this testimony did not prejudice Appellant. The overwhelming bulk of the evidence presented by the Commonwealth related to Appellant's motive for shooting Grover, her formulation of the plan to shoot Grover and the execution of this plan. The

- 14 -

Commonwealth's closing argument focused on the evidence relating to Appellant, not evidence relating to Helgenberg or Appellant's father. N.T., 9/9/14, at 64-100 (closing). Brown's brief testimony concerning Helgenberg and Appellant's father does not undermine our confidence in the outcome of this case.

Next, Appellant claims that defense counsel was ineffective for failing to move to strike all references to her relationship with E.D. after the trial court granted her motion for judgment of acquittal on the charge of attempting to murder E.D. Appellant argues that "during its case-in-chief, the Commonwealth painted [Appellant] as an uncaring mother who sufficiently hated [E.D.] so much that she tried to kill him." Appellant's Brief at 27. Appellant continues that because "the prejudice of such evidence is readily apparent," defense counsel should have moved to strike this evidence after the judgment of acquittal on the charge of attempting to murder E.D. *Id.* We agree with the Commonwealth that this argument lacks merit. The Commonwealth correctly points out that despite the judgment of acquittal on the murder charge, the charge of aggravated assault against E.D. remained intact. Commonwealth's Brief at 23. Furthermore, under the relevant subsection of the aggravated assault statute, 18 Pa.C.S.A. § 2702(a)(1), because E.D. was not injured, "the Commonwealth needed to prove that Appellant intentionally or knowingly attempted to cause serious bodily injury to E.D." *Id.* Thus, as the Commonwealth observes, "evidence of [Appellant's]

vitriol toward [E.D.] was relevant to prove that she was intentionally attempting to cause him serious bodily injury." ***Id.***

Finally, Appellant argues that she is entitled to relief based on the cumulative prejudice caused by defense counsel's errors. There is no basis for a cumulative error argument, because none of Appellant's claims have merit. ***Commonwealth v. Spotz***, 18 A.3d 244, 321 (Pa. 2011) ("no number of failed claims may collectively warrant relief if they fail to do so individually").

For these reasons, the PCRA court properly denied Appellant's PCRA petition.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 7/29/2020*